### 2214

Joe LOVE and Rusty Love, Love Bros., a Partnership, Appellants v. Steve GAMBLE, Individually, d/b/a Sardinia Cucumber Company, and Vlasic Foods, Inc., Respondents.

(448 S.E. (2d) 876)

Court of Appeals

*Ernest J. Jarrett* and *Helen T. McFadden, Jenkinson, Jenkinson & McFadden,* Kingstree, *for appellants.*

*William H. Johnson* and *Ray E. Chandler,* Manning; and *Monteith P. Todd,* Columbia, *for respondents.*

Heard June 8, 1994.

Decided August 15, 1994.

CURETON, Judge:

This case involves the growing, buying and selling of cucumbers for the production of pickles. The appellants (the Loves) sued the respondents (Sardinia and Vlasic) for breach of contract, interference with and wrongful termination of an agency relationship, and interference with a prospective contractual advantage. At the close of the evidence, the trial judge granted a directed verdict to the respondents on the issue of liability on all causes of action. We affirm. Accordingly, we do not reach the damages issue raised by the Loves.

## FACTS

Vlasic Foods, Inc. buys cucumbers primarily for the purpose of producing pickles. Steve Gamble d/b/a Sardinia Cu-

cumber Company (Sardinia) entered into a relationship with Vlasic in 1985 to furnish Vlasic a quantity of cucumbers each year for a period of five years commencing in 1986. To fulfill the requirements of that agreement, Sardinia grew a quantity of cucumbers itself and also contracted with other growers to furnish cucumbers to make up the difference.

In 1988, Sardinia and the Loves signed a letter of intent whereby the Loves agreed to "establish a cucumber buying station at [their] farm . . . as an independent contractor to purchase cucumbers of Sardinia Cucumber Company." The letter of intent (hereinafter referred to as agreement) further provided that Sardinia would provide all equipment needed by the Loves; the cucumbers would be bought in the name of Sardinia; the Loves would establish a bank account in Sardinia's name for the purpose of buying the cucumbers; and as compensation for their services, the Loves would receive a commission of $.50 per bushel for each bushel of cucumbers bought. The agreement was for the calendar year 1989. The Loves agreed to provide all labor for the buying station and pay all costs associated with it, i.e., wages, insurance, etc. Additionally, the Loves agreed to maintain the equipment Sardinia furnished. The agreement make no mention of quantity or the price of the cucumbers the Loves were to buy for Sardinia. Importantly, it said nothing about the Loves growing cucumbers for Sardinia.

As it turned out Vlasic provided most of the equipment for the Loves' operation, either through Sardinia or directly to the Loves, and repaired the equipment when needed. Additionally, Vlasic provided the seeds to the Loves for planting. According to the Loves, at the time the Loves and Sardinia signed the letter of intent, Gamble told them that they would be working for both Vlasic and Sardinia. There is no indication, however, that Vlasic ever told the Loves they worked for it or otherwise indicated there was any "contractual relationship" between Vlasic and the Loves.[1]

In preparation for performance of the 1988 agreement, the Loves made minor modifications/improvements to their existing facilities as suggested by Vlasic's engineers. Also at the suggestion of Vlasic and/or Sardinia, the Loves made three

---

[1] The Loves characterize their relationship with Vlasic and Sardinia as Principal-Agent with Vlasic and Sardinia being "joint principals."

changes to their agricultural practices. First, they planted a different kind of seed which produced cucumbers more suitable for Vlasic's needs. Second, they bought a new planter which planted rows 48-inches wide instead of the 38-inch rows they previously planted. Third, they staggered their planting times so that all cucumbers would not be ready for harvest at the same time.

Despite the absence of a formal agreement, Sardinia and the Loves performed under the terms of the "letter of intent" for the entire year of 1989, i.e., the spring and fall growing seasons.[2] Without renewing the letter of intent, they likewise performed under its basic terms for the spring season of 1990.

The spring 1990 cucumber crop was a bumper crop. The Loves delivered 103,000 bushels to Sardinia, more than double the expected amount. On June 28, 1990, Sardinia advised the Loves that it would not accept any additional cucumber shipments after June 29, 1990, this date being about two weeks prior to the end of the spring 1990 harvest season. The Loves sold their remaining cucumber crop to another pickle company and make no claim for losses for the spring 1990 crop.

On July 20, 1990, Sardinia advised Love that it would not be accepting any cucumber shipments from the Loves for the fall 1990 season. The Loves called Vlasic about this, and Vlasic advised them that it was Sardinia's decision to make. On February 12, 1991, Sardinia advised the Loves that it would not be accepting any cucumber for the spring 1991 season. This was about six weeks before commencement of the spring cucumber planting. On February 26, 1991, Vlasic removed its equipment from the Loves' operation site, thereby making it clear there would be no business relationship between Sardinia and the Loves for the spring or fall 1991 seasons. The existence, duration and manner of termination of the relationship between the Loves and Vlasic and/or Sardinia after the spring 1990 growing season is the central issue in this appeal.

### Standard of Review

In reviewing the grant of a directed verdict motion, we view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving

---

[2] Testimony established that cucumber growers generally have two growing seasons, one in the spring and one in the fall.

party. *See Moore v. Levitre,* 294 S.C. 453, 365, S.E. (2d) 730 (1988). However, this does not mean that the court should ignore facts unfavorable to the opposing party. In essence, the court must determine whether a verdict for the opposing party "would be reasonably possible under the facts as liberally construed in his favor." *Bultman v. Barber,* 277 S.C. 5, 7, 281 S.E. (2d) 791, 792 (1981).

## Breach of Contract

The controlling inquiry here is whether the Loves had a contract with Gamble and/or Vlasic for any growing season after the spring 1990 season. There is no evidence of a written or oral contract between the Loves and Gamble or Vlasic after the expiration of the Gamble-Love "letter of intent" for 1989. Thus, any contract between the Loves and Gamble and/or Vlasic for any growing season after 1989 necessarily had to be implied. *See Stanley Smith & Sons v. Limestone College,* 283 S.C. 430, 322 S.E. (2d) 474 (Ct. App. 1984) (express contract is manifested by words, written or oral; implied contract is manifested by conduct but, as with an express contract, the conduct must demonstrate the parties' mutual assent to all essential terms of the contract); *see also Morgan v. Honeycutt,* 277 S.C. 150, 283 S.E. (2d) 444 (1981) (silence alone is not conduct constituting acceptance of an offer to contract).

The Loves admitted they never specifically discussed a contract with anyone for any growing season after 1989. At bottom, the Loves argue they had a right to assume they would continue their 1989 arrangement with Gamble and/or Vlasic in 1990 and 1991 unless specifically told otherwise. They base this assumption on the following circumstances: (1) Gamble and/or Vlasic never gave them timely notice that they would not be growing cucumbers or operating a shed in the fall of 1990 and for 1991; (2) The Loves operated a "pickle shed" and grew cucumbers for Gamble and/or Vlasic in the spring of 1990 without a written contract allegedly on the same terms as the 1988 letter of intent; and (3) Vlasic's equipment remained on the Loves' premises after the spring 1990 growing season.

During oral argument, counsel for the Loves made it clear that had Gamble and/or Vlasic given the Loves timely notice that they did not intend to purchase cucumbers from them for the fall 1990 season and the 1991 seasons, then the Loves would have no claim against Gamble and/or Vlasic. The Loves

base their "timely notice" argument on a purported custom and usage in the cucumber industry. They contend that absent notice for an acceptable period of time before each growing season, growers and shed operators customarily assume that prior relationships with cucumber buyers like Gamble and Vlasic will continue into the next cucumber season.

To establish such a custom and usage, the Loves proffered the testimony of Chuck Easler, a 21-year-old farmer, as an expert. The trial judge refused to qualify Easler as an expert and excluded his testimony, finding Easler's limited and unique experience as a cucumber farmer and shed operator did not qualify him to testify as an expert on customs and usages in the industry. The Loves claim this was error. We disagree.

A review of the proffered testimony of Easler demonstrates that his experience in the cucumber industry was limited to working in and managing his family's business, which had a unique "life time" relationship with a shed operator.[3] Moreover, the admission or exclusion of evidence, including the decision to qualify a witness as an expert, resides in the sound discretion of the trial judge. *See powers Constr. Co. v. Salem Carpet, Inc.*, 283 S.C. 302, 322 S.E. (2d) 30 (Ct. App. 1984) (no abuse of discretion in refusing to qualify witness as expert). The appellate courts will not reverse a trial court's decision to exclude evidence absent a clear abuse of discretion, the commission of legal error in its exercise, and prejudice to the rights of the appellant. *See Fontaine v. Peitz*, 291 S.C. 536, 354 S.E. (2d) 565 (1987); *Bonaparte v. Floyd*, 291 S.C. 427, 354 S.E.(2d) 40 (Ct. App. 1987). The Loves have failed to show the exclusion of the proffered testimony of Easler was an abuse of discretion or prejudiced them. *See Rental Uniform Serv. of Greenville, S.C., Inc. v. K & M Tool and Die, Inc.*, 292 S.C. 571, 357 S.E. (2d) 722 (Ct. App. 1987) (purpose of a proffer is to demonstrate prejudice in the exclusion of evidence).

Furthermore, Easler never testified to a custom in the industry; his testimony related solely and specifically to how he did things. A usage or custom to be recog-

---

[3] Easler took over his father's business. The family had a 30-year relationship with a shed operator who agreed to accept cucumbers from Easler for as long as he was in business.

nized by the law must be long-standing, general in its opera-tion, known to, and acquiesced in by all whose rights are af-fected by it and be just and reasonable in its operation. *Hayward v. Middleton*, 14 S.C.L. (3 McCord) 121 (1825). It must also have "such regularity of observance in a . . . trade as to justify an expectation that it [will] be observed with respect to the transaction in question." S.C. Code Ann. § 36-1-205(2) (1976). Custom and usage in an industry may "supplement or qualify terms of an agreement." S.C. Code Ann. § 36-1-205(3) (1976). However, we know of no authority for the proposition that custom and usage alone can create a contract and give rise to a meeting of the minds on all essential terms of the con-tract. *See* 21A Am. Jur. (2d) *Customs and Usages* § 23 (1981) (A custom or usage cannot take the place of a contract or cre-ate a contract where none has been made by the parties). We therefore hold the evidence fails to establish such a custom and if it did, it would not establish a contractual relationship between the Loves and Vlasic and/or Sardinia.

The Loves also argue by continuing to do business with Gamble and/or Vlasic in the spring of 1990, they re-newed the 1988 agreement for the years 1990 and 1991. As noted above, the 1988 agreement does not cover the sub-ject of cucumber growing, but covers only the matter of the Loves buying cucumbers for Sardinia. The Loves' counsel brings to our attention the annotation in 6 A.L.R. (3rd) 1352 which she asserts supports this implied renewal theory. *See* J.D. Emerich, Annotation, *Continuation of Agency Beyond Contract Period As Extending Contract For Like Period*, 6 A.L.R. (3rd) 1352 (1966). The annotation argues that where one who has been employed by another for a fixed period con-tinues in the service of the employer after expiration of that period, it is presumed, in the absence of anything to show a contrary intention, that the continued services of the em-ployee are to be rendered for the same period as that fixed by the original employment agreement. We agree that the fact the Loves furnished Sardinia cucumbers in the spring of 1990 on the same terms as during 1989 is evidence the parties in-tended to operate during the spring 1990 growing season under the same terms as the 1988 agreement. *See* 17A Am. Jur. (2d) *Contracts* § 605 (1991). However, there is no evi-dence in the record that Vlasic and/or Gamble intended that

the terms of the 1988 agreement should extend beyond the spring 1990 growing season. *See* 17A Am. Jur. (2d) *Contracts* § 605 (an implied contract must be manifested in the joint and mutual intentions of the parties). Unlike, the spring 1990 season, the Loves did not in fact furnish cucumbers to or buy cucumbers for Gamble and/or Vlasic in the fall of 1990 and in 1991, as they had in 1989. So, unlike the factual situation contemplated in the Annotation and American Jurisprudence cite noted above, the facts of this case do not reflect that after the expiration of their 1988 contract and subsequent extension into the spring of 1990, the parties continued to perform as they did in 1989. In any event, neither the A.L.R. (3rd) annotation or the Am. Jur. (2d) cite supports a renewal of the 1988 agreement for the year 1991. Accordingly, we hold this argument lacks merit.

■ The Loves' final argument relies upon the fact Vlasic's equipment remained on their premises after the spring 1990 season. The argument is in the nature of estoppel or detrimental reliance. Any such reliance must be reasonable and justifiable. *See Powers Constr. Co. v. Salem Carpets, Inc.,* 283 S.C. 302, 322 S.E. (2d) 30 (Ct. App. 1994). The Loves clearly did not rely on the equipment's presence to assume an implied contract for the fall of 1991, since Vlasic removed the equipment in February 1991 long before any purported notice should have been given for the fall 1991 growing season as asserted by the Loves. As to the spring 1991 season, any reliance was also unreasonable as a matter of law, because the Loves already knew that Sardinia had terminated their "relationship" for the fall 1990 growing season in July 1990. Also, the Loves were aware that the tremendous size of the spring 1990 crop was likely to cause production cutbacks. Furthermore, the Loves' own witness testified that he would try to notify his grower by "January or February" of the acres of cucumbers they would need to plant. We hold, as did the trial judge, that the Loves had a duty to inquire about their future status as a grower and shed operator, rather than silently assume they would continue to furnish cucumbers in the future.

Likewise, the Loves could not have reasonably relied on the equipment's continued presence on their premises to make any assumptions about the fall 1990 growing season. Clearly, the Loves used the equipment to process the spring 1990 crop

until days before they received notice from Sardinia that it would not accept any more cucumbers from the Loves for the spring growing season. The record also reflects that early spring 1990, the Loves talked to Sardinia about not planting a fall crop. They had this same conversation with at least one of their growers. Moreover, one of the Loves testified that in June he talked to Sardinia in an effort to determine whether or not they and their growers should plant a fall crop and Gamble said "I don't know, I don't know."[4] We, therefore, sustain the trial court's holding that the Loves' reliance upon the presence of the equipment on their premises is an insufficient basis for finding a contractual relationship existed between the Loves and Sardinia and/or Vlasic after the spring of 1990.

Wrongful Termination of
Agency Relationship

The Loves rely on the case of *deTreville v. Outboard Marine Corp.*, 439 F. (2d) 1099 (4th Cir. 1971) for the proposition that an action for tortious termination of agency lies when a principal terminates an agency with bad intent. Additionally, they argue that because they provided consideration beyond their mere services, Vlasic and Sardinia should not be permitted to terminate their agency if it would frustrate their *"reasonable expectation(s)"* (emphasis added). *See Burger Brewing Co. v. Summer*, 261 F. (2d) 261 (4th Cir. 1958); *Jack's Cookie Co. v. Brooks*, 227 F. (2d) 935 (4th Cir. 1955), *cert. denied*, 351 U.S. 908, 76 S.Ct. 697, 100 L.Ed. 1443 (1956). Vlasic and Sardinia argue that no such cause of action exists in South Carolina. While federal cases state "an actionable wrong" is committed under South Carolina law if the "manner of termination" of a contractual relation is "contrary to equity and good conscience," *deTreville*, 439 F. (2d) 1099, we have located no South Carolina case that recognizes such a cause of action in tort.

Regardless of whether the cause of action exists in South Carolina, the Loves recognize that in order to recover under such a cause of action, they must prove an agency relationship existed between them and Sardinia and/or Vlasic by established facts. *McCall v. Finley*, 294 S.C.

---

[4] The evidence appears to suggest that June would not be too late for Gamble to notify the Loves that no fall crop would be needed.

1, 362 S.E. (2d) 26 (Ct. App. 1987). Vlasic and Sardinia argue there was no agency relationship between the parties because the 1988 agreement refers to the Loves as independent contractors. Arguably, the Loves could have been agents for Gamble and/or Vlasic in spite of the language of the agreement. *See McNeill v. Electric Storage Battery Co.*, 109 S.C. 326, 96 S.E. 134 (1918) (If provisions of contract make it one of agency, it is immaterial by what names the parties call themselves in the contract). An independent contractor can also be an agent; the two are not mutually exclusive. *State ex rel. McLeod v. C & L Corp., Inc.*, 280 S.C. 519, 313 S.E. (2d) 334 (Ct. App. 1984). Nevertheless, a mere agency relationship may be terminated at the will of the principal unless the agency is coupled with an interest. *Fass v. Atlantic Life Ins. Co.*, 105 S.C. 107, 89 S.E. 558 (1916); 3 Am. Jur. (2d) *Agency* § 43 (1986). Because of our resolution of the agency issue, we need not mire ourselves in this dispute.

Ordinarily, an agency which is to last for a fixed period will terminate upon the expiration of the time specified. 3 Am. Jur. (2d) *Agency* § 37 (1986). Because the Loves base their claim of an agency relationship upon an implied contract, and because we have found no such contract existed, we now hold there was no agency relationship for the same reasons there was no contractual relationship after the spring 1990 season. Thus, there was no wrongful termination of an agency relationship and the trial court did not err in not submitting this issue to the jury.

Wrongful (Tortious) Interference with
Agency (Contractual) Relationship

The Loves argue that because Vlasic and Gamble knew long before February 12, 1991 that Vlasic would cut back on the amount of cucumbers it would need in the spring of 1991, both had a duty to advise the Loves of the cut back in time for them to contract with another company to sell their cucumbers. The Loves claim Vlasic and Gamble "interfered with [their] capacity to enter into further negotiations due to the fact that they were not given timely notice that they were not to be used by Gamble and Vlasic." The elements of the tort of wrongful interference with an existing contractual relationship are as follows:

(1) A contract, (2) knowledge of the contract by the wrongdoer, (3) an intentional procurement of the contract's breach, (4) the absence of justification, and (5) damages resulting therefrom.

*Todd v. S.C. Farm Bureau Mut. Ins. Co.,* 287 S.C. 190, 336 S.E. (2d) 472 (1985); *DeBerry v. McCain,* 275 S.C. 569, 274 S.E. (2d) 293 (1981). The contract that is caused to be breached must be valid and enforceable. *See Collins Music Co. Inc. v. Ingram,* 292 S.C. 537, 357 S.E. (2d) 484 (Ct. App. 1987). Here, there was insufficient evidence to submit this cause of action to the jury. There is no evidence of an express or implied contractual relationship after the spring of 1990, and the intentional procurement of the breach of that relationship. Moreover, and importantly, the Loves assert no involvement (interference) by a third party. *See Chitwood v. McMillan,* 189 S.C. 262, 1 S.E. (2d) 162 (1939). There the court explains the cause of action of tortious interference with contractual relations as follows:

> The theory of this doctrine is that the parties to a contract have a property right therein, which a third person has no more right maliciously to deprive them of, or injure them in, than he would have to injure their property. Such an injury, without sufficient justification, amounts to a tort for which the injured party may seek compensation by an action in tort for damages.

*Id.* at 266, 1 S.E. (2d) at 163, *accord Crowe v. Domestic Loans, Inc.,* 242 S.C. 310, 130 S.E. (2d) 845 (1963); *Smith v. C & S Nat'l Bank of S.C.,* 241 S.C. 285, 128 S.E. (2d) 112 (1962). Accordingly, this claim has no merit.

Wrongful Interference with
Prospective Advantage

The tort of intentional interference with prospective contractual relations was first recognized in the case of *Crandall Corp. v. Navistar Transp. Corp.* 302 S.C. 265, 395 S.E. (2d) 179 (1990). The elements of the cause of action are (1) the intentional interference with the plaintiff's potential contractual relations, (2) for an improper purpose or by improper methods, (3) causing injury to the plaintiff.

Like their cause of action for wrongful interference with agency (contractual) relations, the Loves premise this cause of action on the duty of Vlasic and/or Sardinia to give them timely notice. They again argue that had they received timely notice, they could have contracted with another shed operator or pickle company to buy their cucumbers and continued their operations after the spring 1990 season. They argue that Vlasic's and/or Sardinia's failure to give them timely notice wrongfully interfered with these prospective contracts. We affirm for two reasons. First, assuming there is evidence of a potential contractual relationship with another cucumber buyer,[5] there is no evidence Vlasic and/or Sardinia intentionally interfered with such relationship. Secondly, there is no evidence of improper purpose or improper methods utilized by Vlasic and/or Sardinia. In *Crandall*, the court points us to the Virginia case of *Duggin v. Adams*, 234 Va. 221, 360 S.E. (2d) 832 (1987) for a discussion of improper methods. There it is said:

> Methods of interference considered improper are those means theat are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship.
>
> Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods.

*Id.* at 227-228, 360 S.E.(2d) at 836-837 (citations omitted).

Here, the evidence reflects only that Vlasic reduced its requirements for cucumbers starting with the fall 1990 season

---

[5] Although there is evidence that the Loves could not have entered into any contracts at the time they received actual notice from Sardinia, there is no direct competent evidence that the Loves could have done so had they received the "timely notice" they contend should have been given. There is no testimony from other shed operators or pickle companies to the effect that had the Loves come to them earlier in 1990 or 1991, they would have contracted with them. This claim is entirely too speculative to warrant relief.

because of an overabundance of cucumbers from the spring 1990 season. Additionally, the evidence shows that Sardinia unilaterally chose to eliminate the Loves as a source of cucumbers rather than reduce the quantity of cucumbers it purchased from other growers and shed operations with whom it had a longer relationship. While Sardinia may have been dilatory in notifying the Loves that their cucumbers would not be needed for the fall 1990 and spring 1991 seasons,[6] there is no evidence this delay was occasioned for an improper purpose or by improper methods. Accordingly, we find this cause of action to be without merit.

Affirmed.

HOWELL, C.J., concurs.

SHAW, J., concurs in result only.

---

[6] We again point out that the Loves did not establish a custom or usage in the cucumber industry that shed operators like themselves should be notified by a certain time of the year that their cucumbers would not be needed for the next growing season and in default thereof such shed operators could assume it would be business as usual for the next growing season.