**ROYAL INSURANCE COMPANY OF AMERICA, as subrogee and assignee of Carolina Material Handling, Inc.,** Plaintiff,

v.

**RELIANCE INSURANCE COMPANY** Defendant.

No. CIV.A. 8:00–1256–13BG.

United States District Court, D. South Carolina, Anderson Division.

April 19, 2001.

Andrew Kenneth Epting, Jr., Charleston, SC, for plaintiff.

Thomas L. Stephenson, Greenville, SC, for defendant.

### *ORDER*

KOSKO, United States Magistrate Judge.

■ This is a case of first impression in South Carolina. Plaintiff Royal Insurance Company of America (Royal) complains that Defendant Reliance Insurance Company (Reliance) paid its primary insurance policy limits directly to a plaintiff who was suing their mutual insured. Royal maintains that primary insurers owe a continuing duty to excess insurers never to com-

promise their joint leverage with respect to plaintiffs. If such a compromise occurs, Royal argues that the excess insurer should then recover from the primary insurer its ultimate settlement payments as damages. Royal asserts that this duty arises from an alleged custom of the insurance industry.[1]

This Court has jurisdiction over this dispute by virtue of title 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy is in excess of Seventy Five Thousand Dollars ($75,000.00) exclusive of interest and costs. Venue is properly laid in this Court pursuant to title 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District. Pursuant to agreement of the parties, this matter is before the undersigned for non-jury trial. 28 U.S.C. § 636(c).

## THE PARTIES AND THEIR INSURED

In 1993, Carolina Material Handling, Inc. (CMH) insured its employees against workplace injury through two insurance policies purchased from Reliance and Royal.[2] Reliance, as primary insurer, provided Nine Hundred Thousand Dollars ($900,000) of liability insurance coverage, above a CMH retention of One Hundred Thousand Dollars ($100,000). Royal, as excess insurer provided additional liability coverage of Five Million Dollars ($5,000,000).

### WOOD v. GASTON COPPER & CMH

On September 14, 1993, an accident occurred at the plant of Gaston Copper Recycling Corporation (Gaston Copper) in Gaston, South Carolina. CMH had a contract with Gaston Copper to repair a crane on the Gaston premises. Charles D. Wood, an employee of CMH, was working on the job, when a cement-filled bucket fell from a crane striking him.

Responsibility for this catastrophic event remains an open question. The bucket was a clumsy substitute ballast which Gaston Copper employees were using to lower the crane hook. Thus Gaston Copper had created a hazardous condition. On the other hand, CMH employees, like Wood, were proud of the company slogan, "We

---

1. Royal argues that custom becomes law over time. It invokes *Love v. Gamble*, 316 S.C. 203, 448 S.E.2d 876 (S.C.App.1994) which, however, was an action on an implied contract. The *Love* case applied the Uniform Commercial Code, § 36–1–205(2) Code of Laws of South Carolina and cited the nineteenth century case of *Hayward v. Middleton*, 14 S.C.L. (3 McCord) 121 (1825), an action in assumpsit. *Hayward* and its progeny tell us that custom may be *recognized* by law in interpreting contracts. See *Burden v. Woodside Cotton Mills*, 104 S.C. 435, 89 S.E. 474 (1916); *Friedheim v. Walter Hildic Co.*, 104 S.C. 378, 89 S.E. 358 (1916); *Thomas v. Graves*, 8 S.C.L. (1 Mill Const.) 308 (1817); *Walker v. Chichester*, 4 S.C.L. (2.Brev.) 67 (1806). In the end, however, *Love* held that custom and usage alone cannot create a contract. This rule is of no use, therefore, to Royal in this case.

Custom is also part of negligence law. The *Restatement (Torts) 2d,* § 295A declares: "In determining whether conduct is negligent, the customs of the community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them." This variant of custom, however, presupposes that a duty already exists. Royal in this case is attempting to create a duty which so far the law has not recognized.

2. Prior to 1996, South Carolina permitted employers such as CMH to self-insure and thus "opt out" of the statutory regime of workers compensation. §§ 42–1–330 and 42–1–340 Code of Laws of South Carolina (repealed by 1996 Act. 424 § 10). Opting out, however, meant that the self-insured employer could not assert affirmative defenses in negligence cases: the employee's negligence; negligence of a fellow employee; or assumption of the risk. § 42–1–510 Code of Laws of South Carolina (repealed by 1996 Act 424 § 11)

Stand By Our Work, Not Under It." Wood himself could, thus, have been guilty of negligence or assumption of the risk by standing under the bucket. Then again, conditions in the Gaston Copper plant were dark and dusty, witnesses said, which could have prevented Wood from being aware of the danger. While causation is not an issue in this case, the existence of these conflicting views is very important for an understanding of the present lawsuit.

Miraculously, Wood survived the accident, but he was badly injured and ultimately rendered paraplegic. Wood was married. Complicating the situation, his wife, Judy, suffered from cerebral palsy. She had depended upon him to be her caretaker and also to play a major role in rearing their three children. Suddenly and permanently, their roles were reversed. Despite her affliction, she was forced to shoulder the major burdens of family life—for the rest of their lives.

On February 16, 1995, Charles Wood filed an action against both Gaston Copper and CMH in the state courts of South Carolina, and Judy Wood sued for loss of consortium. These actions alleged negligence against both the defendants. While CMH was statutorily barred from asserting most affirmative defenses; Gaston Copper was not.

Aside from the legal questions of proximate causation, statutory employment status under the Workers Compensation Act, and indemnification, the Woods' case also presented a question of value. The Woods' attorney, J. David Standeffer, testified at the trial of this case: "I thought that there was an outside chance or a chance that we could even get as high as a[n] eight figures in that case, I knew it would never settle for that. That would have to be a trial verdict if we got that." [3]

As discussed below, the record contains evidence of jury verdicts in comparable cases between Eight and Ten Million Dollars ($8,000,000–$10,000,000) as well as a range of values supplied by the parties' expert witnesses.

Gaston Copper bought its peace in February, 1996. Its carrier, Insurance Company of North America (INA), settled with the Woods by paying Three Hundred Fifty Thousand Dollars ($350,000) as a lump sum and thereafter paying Two Thousand Three Hundred Seventy Six Dollars ($2,376) monthly for Wood's life. The total present value of the settlement agreement was between Eight Hundred and Nine Hundred Thousand Dollars ($800,000/$900,000). [4]

Although CMH managed to keep Gaston Copper in the lawsuit on a cross-claim, the INA settlement clearly left CMH exposed for the entire remaining value of the claim and bereft of any affirmative defenses. On September 5, 1996, Attorney F. Dean Rainey, as independent counsel for CMH, wrote to Reliance, and to Royal, demanding that both insurers offer their policy limits to the Woods under South Carolina's *Tyger River* doctrine, which in South Carolina bears the name of the lead case dealing with the duty of insurers to defend and reasonably settle claims against the insured. *Tyger River Pine Co. v. Maryland Casualty Co.*, 170 S.C. 286, 170 S.E. 346 (S.C.1933).

On October 7, 1996, Reliance paid its policy limits of Nine Hundred Thousand Dollars ($900,000) to the Woods. Almost a year later, on September 13, 1997, Royal concluded the case by paying to the Woods the sum of One Million One Hundred Twenty Five Thousand Dollars ($1,125,-000), approximately one fourth of its policy coverage. In all, the Woods received from

---

3.  Transcript, pp. 112–113.

4.  Transcript, pp. 37, 88

Gaston Copper ($800,000–$900,000), from Reliance ($900,000), from CMH ($100,000), and from Royal ($1,250,000), for a total settlement exceeding Three Million Dollars ($3,000,000).

## I. THE DUTY NOT TO PAY

■ Royal argues that Reliance should not have paid the Woods directly. Instead, Royal claims that primary insurers owe a duty to tender policy limits only to the excess insurers, and never to pay victims directly. To pay the victim, Royal asserts, is negligent claims adjustment. Therefore, because Reliance did in fact pay the Woods, Royal claims that a part of its ultimate settlement is a damage. Specifically it is a damage caused by Reliance's breach of the duty owed by primary to excess insurance carriers to maintain a united insurance front against suing plain-

tiffs. More starkly stated, the position of the excess carrier is that it is the primary insurer's duty to give no aid to the victim, thus by financial necessity forcing the victim to accept a lesser amount from the excess insurer.

The existence of such a duty is a question of first impression in South Carolina. While Royal argues that this duty exists by reason of custom or usage in the insurance industry, it also bases its claim alternatively on South Carolina's *Tyger River* doctrine of bad faith insurance claims settlement and/or equitable subrogation.[5]

## II. INSURANCE INDUSTRY CUSTOM

Royal insists that it is the custom of the insurance industry to pay primary coverage to excess insurers and never to victims. It is hard to find this principle explicitly stated in either insurance law cases or the literature of the industry.[6]

---

5. Royal's Complaint alleges it is an "assignee and subrogee" of the insured, CMH. At various times, Royal has claimed to hold an actual assignment of rights from CMH, but the instrument was never introduced into this litigation. Thus, claims resting upon assignment are deemed abandoned. The Complaint states causes of action for bad faith and negligence and also seeks a declaratory judgment. The action for declaratory judgment asked the Court to strike a provision for policy release contained in the Reliance policy. This cause of action, too, seems to have been abandoned at trial. Thus, Royal has proceeded in this case on theories of negligence, *Tyger River* bad faith, and equitable subrogation.

6. The *Guiding Principles for Insurers of Primary and Excess Coverages* were adopted in 1974 by the Claims Executives Council, composed of the American Insurance Association, the American Mutual Insurance Alliance, and eight unaffiliated companies. The *Guiding Principles* have been used by courts as at least an indication of insurance business practice. *See United States Fire Insurance Company v. Nationwide Mutual Insurance Company*, 735 F.Supp. 1320 (E.D.N.C.1990); *American Centennial Insurance Company v. Warner–Lambert Company*, 293 N.J.Super. 567, 681 A.2d 1241 (1995). Basically, there are nine rules:

1. The primary insurer must discharge its duty of investigating promptly and diligently even those cases in which it is apparent that its policy limit may be consumed.
2. Liability must be assessed on the basis of all relevant facts which a diligent investigation can develop and in light of applicable legal principles. The assessment of liability must be reviewed periodically throughout the life of a claim.
3. Evaluation must be realistic and without regard to the policy limit.
4. When from evaluation of all aspects of a claim, settlement is indicated, the primary insurer must proceed promptly to attempt a settlement, up to its policy limit if necessary, negotiating seriously and with an open mind.
5. If at any time, it should reasonably appear that the insured may be exposed beyond the primary limit, the primary insurer shall give prompt written notice to the excess insurer, when known, stating the results of investigation and negotiation, and giving any other information deemed relevant to a determination of the exposure, and inviting the excess insurer to participate in a common effort to dispose of the claim.
6. Where the assessment of damages, considered alone, would reasonably support payment of a demand within the primary policy limit but the primary insurer is unwilling to

Thus, the Court is left with the testimony provided by the parties at trial. Royal called two independent attorneys as expert witnesses to establish that payment to the excess insurer, not to the victim, is the custom and usage of the industry. Royal also produced its own claims employee, Gene Murray, and the attorney, James H. Watson, who was retained to handle the Woods' case. Reliance produced one independent attorney as expert witness, along with its own Vice–President, Michael Mangino, and the counsel it retained for the Woods' case, William Kehl. Reliance also called the Woods' attorney, J. David Standeffer, as well as the attorney for CMH, F. Dean Rainey.[7]

Royal's first expert witness testified that a critical moment in the Woods' case occurred in February, 1996, when Gaston Copper achieved its separate settlement with the Woods. At that point, the plaintiffs had already received approximately One Hundred Thousand Dollars ($100,000) of benefits directly from CMH. Thereby, the Woods acquired access to the total sum of about One Million Dollars ($1,000,000), characterized as a "financial cushion" with which to continue prosecuting their claims against CMH.

At least three times in his testimony, this witness described how such money reduced the "leverage" which Royal could bring to bear in settlement negotiations.[8] Thus, the witness calculated, the additional

---

pay the demand because of its opinion that liability either does not exist or is questionable and the primary insurer recognizes the possibility of a verdict in excess of its policy limit, it shall give notice of its position to the excess insurer when known. It shall make available its file to the excess insurer for examination, if requested.

7. The primary insurer shall never seek a contribution to a settlement within its policy limit from the excess insurer. It may, however, accept contribution to a settlement within its policy limit from the excess insurer when such contribution is voluntarily offered.

8. In the event of a judgment in excess of the primary policy limit, the primary insurer shall consult the excess insurer as to further procedure. If the primary insurer undertakes an appeal with the concurrence of the excess insurer the expense shall be shared by the primary and the excess insurer in such manner as they may agree upon. In the absence of such an agreement, they shall share the expense in the same proportions that their respective shares of the outstanding judgment bear to the total amount of the judgment. If the primary insurer should elect not to appeal, taking appropriate steps to pay or to guarantee payment of its policy limit, it shall not be liable for the expense of the appeal or interest on the judgment from the time it gives notice to the excess insurer of its election not to appeal and tenders its policy limit. The excess insurer may then prosecute an appeal at its own expense being liable also for interest accruing on the entire judgment subsequent to the primary insurer's notice of its election not to appeal. If the excess insurer does not agree to an appeal it shall not be liable to share the cost of any appeal prosecuted by the primary insurer.

9. The excess insurer shall refrain from coercive or collusive conduct designed to force a settlement. It shall never make formal demand upon a primary insurer that the latter settle a claim within its policy limits. In any subsequent proceedings between excess insurer and primary insurer the failure of the excess insurer to make formal demand that the claim be settled shall not be considered as having any bearing on the excess insurer's claim against the primary insurer.

It appears that the *Guiding Principles* are themselves no guide to the correct payment of primary coverage.

7. The Carpenter family, principals in CMH, were regular clients of William Kehl. When he was retained by Reliance, at the Carpenters' request, Kehl realized that a conflict might arise between CMH and Reliance. From an abundance of caution, therefore, he requested that CMH retain independent counsel, and recommended F. Dean Rainey, an experienced and skilled litigator, to protect their interests. [Transcript, pp. 245–246.]

8. Transcript, pp. 38, 42, 44.

payment of Nine Hundred Thousand Dollars ($900,000) by Reliance further reduced this "leverage" as follows:

> So when he's already got basically the first and second million in his pocket, it's pretty hard to convince him not to go for the whole thing and hope for the huge verdict that's going to—you know, that's going to really make waves. But if he didn't have that nine hundred thousand dollars already sealed up, if that was at risk, even though he didn't think it was a great risk, I think I would be able to work on him to convince him to take a lot less than he would under the circumstances of this case.[9]

Royal's second expert witness was a well-known and experienced plaintiff's attorney, who on a regular basis settles or tries multi-million dollar cases. He testified as follows:

> And what you are looking for once you reach that line where they can make it and the family is stable, can you get more? The question—the answer is of course you can get more, but you run the risk of getting less. And that risk of going below the survivability line is always an unacceptable risk to get money which in effect the people don't—can't spend. These are working class people. They really only know how to spend a certain amount.[10]

Later, this expert continued with the view that plaintiffs, such as the Woods, coming from modest backgrounds tend to accept modest settlements not simply because of their class backgrounds but also because the quest for a large jury verdict, compared to money actually on the table, becomes an unacceptable risk:

> But he can't spend the other four thousand dollars. He doesn't know what to

do with it. He got eight thousand dollars a year—a month, tax free. He used to work in a slaughter house in West Virginia, you know, cutting up cows. And he was an electrician and at the peak of his life, and he sounds like a pretty good fellow.

> He was making thirty-five thousand dollars a year. He's got a wife and three kids. He got a modest—his family is modest. Her family is modest. They can't afford to lose. That's what controls the value of the case. They can't afford to lose when this number's on the table. That's it. That's how I get there...And that's where the risk is. The risk is you win your case. You get a nice group of well meaning people. All right. And they go out and give you all the money they can conceive of. Okay. All of it they can conceive of it, and it comes up to be less than that million and a half that's on the table. And it happens all the time. But it don't happen to me because I take the million and a half dollars.[11]

Royal called its own claims employee, Gene Murray. From a strategic point of view, Murray assessed the case as one of primary liability on the part of Gaston Copper for allowing a dangerous condition to persist on its premises. However, by "opting out" of the Workers' Compensation regime, CMH, Murray's insured, had complicated its own defense.[12]

Notwithstanding the statutory bar to most affirmative defenses, Murray nonetheless assessed the exposure of his company, Royal, as minimal. He established a reserve in the amount of One Hundred Thousand Dollars ($100,000) against Roy-

---

9. Transcript, p. 46

10. Transcript, p. 76, 89

11. Transcript, pp. 91, 93

12. Transcript, pp. 136–137, 139

al's coverage of Five Million Dollars ($5,000,000):

> I didn't see this as a real case of liability against Carolina [CMH], but my practice experience has been that attorneys very rarely let excess carriers just walk on serious injury cases. It usually takes some nominal contribution. It could have settled within the Reliance's policy, but I needed something as a cushion. . . . [13]

Mr. Murray was the witness who articulated Royal's view that there was a duty to present a "united front" between primary and excess insurers against plaintiff victims. Since he believed the case was "worth" less than a million dollars, Murray expected a settlement within Reliance's policy limits. If Murray's carrier, Royal, took over the defense, he believed, it would signal a higher value to the Woods and their attorney:

> A: Well, once Royal takes over the defense, that's a clear signal to the plaintiff's attorney that the primary carrier's policy limit is there, is available, and that becomes the floor for any further negotiations.
>
> Q: All right, sir.
>
> A: It's practice many times for a primary carrier to tender to the excess carrier, but still remain at the forefront of the discovery.[14]

In his experience in the insurance industry, Murray claimed that he had never seen a case where the primary carrier paid its money directly to the victim and that this was not customary.[15] Yet, paradoxically, he also testified that when he had seen such payments made, the plaintiffs' appetites were only whetted:

It's been my experience that when the primary limits such as this are paid up front, that it gives the plaintiff an extra cushion—they're cushioned that they can take more of a risk in taking the case to trial. It causes the overall value of the case to go up because there's more risk that the plaintiff is willing to take because they have their—they would have a large foundation of a settlement already there.[16]

The picture of personal injury settlement practice drawn from Royal's witnesses is not a pretty one. Their view is that insurers owe a duty to one another to preserve "leverage" over and against plaintiffs, to exploit the modest expectations and psychological vulnerabilities of ordinary accident victims, and above all to deny plaintiffs a "cushion" from which they could comfortably pursue a larger verdict or settlement. In a letter written to F. Dean Rainey, CMH's attorney, on September 3, 1997, Gene Murray characterized the settlement by Reliance as follows:

> Their action has provided the plaintiffs with a "war chest" to continue to prosecute an action against Carolina Material, and it has also made negotiations more difficult.[17]

Royal's case, thus, rests on its own caricature of the insurance industry as a monolith which must impoverish plaintiffs in order to achieve favorable settlements. Yet even Gene Murray (himself the creator of this caricature) admitted in the end that the practice of starving plaintiffs produces at best mixed results:

> Q: Does it make it easier to settle with the plaintiff if he is not financially well off?

---

13. Transcript, pp. 144–145

14. Transcript, p. 148.

15. Transcript, p. 150

16. Transcript, pp. 150, 152.

17. 12–1, Exhibit C.

A: Sometimes it does, and sometimes it doesn't. They can go both ways. I have had cases go both ways.[18]

■ In opposition to Royal's evidence, Reliance produced its own attorney expert witness who testified that direct payments from primary insurers to plaintiffs, was common practice.[19] Given that the attorney experts disagree among themselves, and given the absence of any guiding authority to establish the duty upon which Royal relies, this Court is not able to conclude that the insurance industry has established a custom or usage with respect to the payment of primary policy limits. Royal's first cause of action, based on negligent claims adjustment, cannot therefore be sustained.

## III. BAD FAITH UNDER THE TYGER RIVER DOCTRINE

■ Royal asserts that a cause of action by excess against primary insurers arises under the line of South Carolina cases following *Tyger River Pine Co. v. Maryland Casualty Co.*, 170 S.C. 286, 170 S.E. 346 (S.C.1933). Undeniably, South Carolina has long imposed a duty upon insurers to diligently and in good faith investigate, evaluate, adjust, settle and/or defend claims. Royal relies upon this *Tyger River* doctrine to contend that Reliance was obligated to pay its policy limits to Royal, rather than to the Woods. Royal claims that the failure so to do is bad faith.

*Tyger River* however is a theory of recovery aimed at insureds or their assignees, as demonstrated by its progeny. *Tadlock Painting Company v. Maryland Casualty Company*, 322 S.C. 498, 473 S.E.2d 52 (S.C.1996); *Charleston County School District v. State Budget and Control Board*, 313 S.C. 1, 437 S.E.2d 6 (S.C.

1993); *Nichols v. State Farm Mutual Automobile Insurance Company*, 279 S.C. 336, 306 S.E.2d 616 (S.C.1983). *Nichols* was foreseen by this Court in *Trimper v. Nationwide Insurance Co.*, 540 F.Supp. 1188 (D.S.C.1982) and *Robertsen v. State Farm Mutual Automobile*, 464 F.Supp. 876 (D.S.C.1979).

South Carolina, however, has not extended this cause of action to third parties who are not named insureds. *Kleckley v. Northwestern National Casualty Company*, 338 S.C. 131, 526 S.E.2d 218 (S.C. 2000); *Gaskins v. Southern Farm Bureau Casualty Insurance Company*, 343 S.C. 666, 541 S.E.2d 269 (S.C.App.2000). In both the *Kleckley* and *Gaskins* cases, the claimants were victims of accidents but were not in privity of contract with the defendant insurers. If South Carolina has not extended *Tyger River* to third-party victims of accidents, it seems improbable that the doctrine would find application in a suit by an excess insurer against a primary insurer in the absence of a contract otherwise providing.[20] If anything, South Carolina seems inclined to the opposite position. Therefore Royal's second cause of action cannot be sustained.

## IV. EQUITABLE SUBROGATION

■ Equitable subrogation exists in South Carolina as a principle of natural justice. *Calvert Fire Insurance v. James*, 236 S.C. 431, 114 S.E.2d 832 (S.C.1960). Its elements are: (1) the party claiming subrogation has paid the debt; (2) the party was not a volunteer but had a direct interest in the discharge of the debt or lien; (3) the party was secondarily liable for the debt or for the discharge of the lien; and (4) no injustice will be done to

---

18. Transcript, p. 153

19. Transcript, p. 278.

20. As noted above, Royal never demonstrated to this Court the instrument of assignment whereby it was making its claim against Reliance under the Complaint.

the other party by the allowance of the equity. *United Carolina Bank v. Caroprop, Ltd.,* 316 S.C. 1, 446 S.E.2d 415 (S.C.1994).

South Carolina has not had occasion to decide upon the availability of equitable subrogation in cases between primary and excess insurance carriers. South Carolina has so far declined to grant equitable subrogation to health insurers, where a statute specifically allows contractual subrogation in health insurance policies. *Shumpert v. Time Insurance Company,* 329 S.C. 605, 496 S.E.2d 653 (S.C.App. 1998). Confronted with the facts of this case, it seems both logical and likely that the South Carolina Supreme Court would apply the principles of equitable subrogation, since the parties both are tied to CMH, the insured, by duties of good faith and fair dealing.

It appears beyond dispute from the trial that the first three tests of equitable subrogation are met affirmatively: Royal did pay into the settlement of the Woods' claims; Royal was not a volunteer; Royal was in fact directly liable for excess liability. Ultimately, the dispositive issue under this theory is whether or not an injustice to Reliance arises by granting the equity. For this purpose, a detailed factual inquiry is made below.

**A. History of the Settlement**

On September 16, 1993, Adjustco (whose role is unknown) generated the first written evidence respecting this case. Its letter to Reliance, ostensibly its principal, regarding the accident outlined a plan for initial investigation.[21] Over the next sev-

enteen (17) months, Reliance corresponded with the Greenville law firm of Ashmore, Rabon and Sullivan, P.A., monitoring medical benefit payments to Charles Wood.[22]

A "Large Loss Report" from Michael Mangino to Reliance Vice–President, Robert Hall, on May 24, 1994, summarized Reliance's view of the case at that time.[23] Mangino noted that CMH, the insured, had serious "exposure" because it had opted out of workers' compensation.

Mr. Gene Murray opened the Royal file on this case in July, 1994.[24] The earliest correspondence between Reliance and Royal seems to be a letter from Mangino to Murray on September 23, 1994.[25] In a pre-trial Affidavit, however, Murray indicated that Royal had previously been notified of the claim by telefax on June 30, 1994.[26] Murray retained Attorney James Watson to represent the interests of CMH and Royal, although it is not clear the time frame of this decision. At least by the Fall of 1994, Reliance and Royal were both aware of, and more or less engaged in, the Woods' claim.

■ The state court case of *Wood v. CMH & Gaston Copper* commenced on February 23, 1995. The Complaint contained a prayer for damages of Twenty Five Million Dollars ($25,000,000).[27] Under South Carolina law, Royal's duty to defend became "absolute" at this moment, because the prayer clearly implicated the excess coverage. *Hartford Accident and Indemnity Company v. South Carolina Insurance Company,* 252 S.C. 428, 166 S.E.2d 762 (1969). Of course, this prayer exceeded the excess insurer's coverage by

---

**21.** Plaintiff's Trial Exhibit 1.

**22.** Plaintiff's Trial Exhibits 5,4,6,7 and 8

**23.** Plaintiff's Trial Exhibit 26

**24.** Transcript, p. 131.

**25.** Plaintiff's Trial Exhibit 13.

**26.** Plaintiff's Response to Motion for Summary Judgment, Tab 17 [22–1]

**27.** -Plaintiff's Response to Motion for Summary Judgment, Tab 11, and Plaintiff's Trial Exhibit # 10 [22–1]

a factor of five. Thus, Murray's rationale for not assuming the defense outright not only became meaningless as a practical matter, but was clearly contrary to South Carolina law.[28]

Reliance hired Attorney William W. Kehl, and the Greenville law firm of Wyche, Burgess, Freeman and Parham to defend this cause of action on March 10, 1995.[29] On March 14, 1995, Kehl wrote to Royal advising of his representation, and drawing attention to the fact that the prayer exceeded Reliance's coverage.[30] This letter by Attorney Kehl represents an almost textbook example of the manner in which primary insurers should discharge the duties they may owe to excess insurers under the law of equitable subrogation.

In the Woods' litigation, Kehl filed a cross-claim against Gaston Copper, to protect CMH, the insured. In July, 1995, Kehl (for Reliance) and Watson (for Royal) actively discussed and cooperated in resisting Gaston Copper's attempt to dismiss this CMH cross-claim. Typical of their correspondence, is a July 24, 1995, letter from Watson to Kehl reporting on consultations with Bobby Carpenter, principal of CMH, their mutual insured.[31] Much later, on April 11, 1996, Kehl argued in opposition to Gaston Copper's Motion to Dismiss the cross-claim and on June 4, 1996, he reported that the Motion had been denied for those claims resting upon equitable indemnity and negligence. Thus, Reliance and its attorney had successively preserved for the benefit of all parties (Reliance, Royal and CMH) the slender reed which was their cross-claim against Gaston Copper.[32]

The July, 1995, letter from Watson also illuminated another aspect of counsel's handling of this case. In his trial testimony, pre-trial deposition and Affidavit, William Kehl clearly articulated his concern about having represented the Carpenter family, and CMH, as counsel prior to being retained by their primary insurer, Reliance. He therefore advised CMH to retain its own independent counsel, and F. Dean Rainey was hired. It would be an understatement to observe that all three attorneys—Kehl, Rainey and Watson—were conducting themselves in accordance with the highest standards of their profession, meticulously documenting their analyses, correctly discerning the limits of their respective representations, and demonstrating superlative strategic and tactical judgment in the context of a very serious litigation.[33]

Meanwhile, the adjusting staff of Reliance kept Royal fully informed of developments and actively solicited Royal's input and participation. For example, Mangino informed Kehl on November 2, 1995, that

---

28. Transcript, p. 148.

29. Plaintiff's Trial Exhibit 9.

30. Plaintiff's Trial Exhibit 10.

31. Plaintiff's Trial Exhibit 30.

32. Plaintiff's Trial Exhibits 20, 15 and 19.

33. -Transcript, pp. 245–246, 268; 22–1, Tab 1, Deposition, pp. 20–21; 12–1, Exhibit D. It is disappointing, though not altogether surprising, that in a "File Memorandum" dated October 8, 1996, Gene Murray cast aspersions upon Attorney Kehl. In this somewhat self-serving paper, Murray related a telephone conversation with Michael Mangino protesting that Reliance's payment to Woods was funding a "war chest against their insured and the excess carrier." In the same paragraph, Murray offered the following insinuation: "I also asked him [Mangino] if he was aware that Mr. Kehl was the insured's personal counsel and had been for years. He seemed surprised by that but said that that may be true, but for the purposes of this litigation, he was counsel retained by Reliance. I do not think he understood the implications of the potential conflict of interest." [Defendant's Trial Exhibit 14.] At least, Kehl, Rainey and Watson had understood and obviated any potential conflict.

he was conferring with Royal about a settlement mediation and that Royal was willing to attend and even make a contribution to settlement. Watson kept Murray fully informed of all correspondence from Reliance's attorney, including a prognostication on July 3, 1996, that Reliance would most likely tender its policy limits and Royal would finally be required to take over the defense.[34]

In fact, Kehl's letter on June 4, 1996, signaled that the time for Reliance to tender policy limits was approaching. During the Summer of 1996, Reliance and Royal both recognized that the excess insurer's coverage was clearly implicated by the course of settlement. It is curious, however, that Watson felt compelled in a letter of June 28, 1996, to suggest to Murray—not once but twice—that his notion of a "nominal" contribution by Royal was unrealistic:

> I told him [Kehl] that I did not know, but assumed we would be willing to sweeten the pot by some nominal amount. We both agreed, however, that a contribution by Royal of some $25–50,000.00 or something in that area probably would not be enough to effectuate a settlement.
>
> Gaston's insurer has already paid approximately $800,000.00, Kehl's insurer might put its coverage of approximately $1 million in the pot, and our thinking is if that won't settle the case, another $25–50,000.00 added to it will not settle it either.[35]

On September 5, 1996, F. Dean Rainey, as independent attorney for CMH, wrote a classic *Tyger River* letter to his colleagues, Kehl and Watson, in which he carefully compared the facts of the Woods' case against three jury verdicts from across South Carolina in which the awards ranged from Eight to Ten Million Dollars ($8,000,000/$10,000,000).[36] The most recent verdict in July, 1996, had been rendered in the normally conservative upstate region in the amount of Eight Million Dollars ($8,000,000) for a lost limb, whereas Wood had been rendered paraplegic. As noted, Wood's wife was suffering from cerebral palsy and had, up to September, 1993, relied upon Wood as her caretaker as well as support in rearing their three children.

It is frankly difficult to understand how, at this point, Murray could have clung to his illusion that Royal would escape its legal responsibility to defend, to settle, and to pay significant sums in this case. Moreover, Reliance's decision to tender its policy limits was not simply a prudent course of action. It had been demanded by CMH, the insured.

## B. Weighing the Equities

The weighing of equities, under a theory of equitable subrogation, boils down to three factual questions in this case. First, at any time did any party believe the Woods' claims would be worth less than One Million Dollars ($1,000,000), the primary coverage and CMH retention? Aside from Murray, no one in this case seems to have seriously entertained this idea. In February, 1995, when Wood's initial Complaint demanded Twenty Five Million Dollars ($25,000,000), all doubt should have been dispelled.

Second, was there at any time a possibility of settling the Woods' claims within the One Million Dollars ($1,000,000) primary policy limits? And if so, when? This question was clearly answered by Woods' attorney at trial:

34. Plaintiff's Trial Exhibits, 14, 33,34 and 35; see also Defendant's Trial Exhibits 5, 6 and 7.

35. Plaintiff's Trial Exhibit 33.

36. Defendant's Trial Exhibit 2.

Q: Did you ever consider setting with Reliance for its limits?

A: No. No.[37]

Third, is there evidence of any acts or omissions by Reliance which prevented settlement of the Woods' claims for less than the Three Million Dollars ($3,000,000) ultimately paid? The record contains no such evidence. Taken as a whole, the record reveals no equities on the side of Royal. Almost from the date of the accident itself, Royal was informed about and closely followed the progress of the Woods' claims. The conclusion is inescapable that Royal has no claim against Reliance under the theory of equitable subrogation, and thus no cause of action.

## V. SPECULATIVE DAMAGES

■ Even if Royal had a theory of recovery, a further fatal flaw in its case is the speculative nature of its damages. Royal invoked the doctrine of "prevention" as a substitute for proof. The argument is that Reliance, through its settlement with the Woods, prevented any lesser settlement which might have been accomplished through pooling of primary and excess insurance funds. Of course, the logical reply to this argument is that Royal was as well placed as any party to propose and initiate such a settlement by offering funds to Reliance. Murray testified himself that a minimal contribution by Royal might have settled the case early on. He provided no explanation why he failed to initiate this process himself.

More fundamentally, however, Royal's reliance on the doctrine of "prevention" is seriously misplaced. The case of *Champion v. Whaley*, 280 S.C. 116, 311 S.E.2d 404 (S.C.App.1984) was a suit upon a conditional contract whereby a broker through an exclusive listing agreement would earn a commission upon sale. The defendant had repudiated the contract, by selling the property to another buyer on the side. He asserted, however, that the failure to consummate the sale offered by the broker relieved him of his obligation to pay the broker's commission. This effort to escape from the contract failed, because of the doctrine of "prevention"—that is, by preventing the condition precedent from arising, the defendant had in fact relieved the broker from or waived the condition and thus he remained bound by the agreement to pay the commission.

The doctrine of "prevention" has yet to be applied as a substitute for proof of damages. In this case, the various witnesses offered ranges of values for the underlying action by the Woods. Murray steadfastly maintained that the claim was worth no more than a total of Two and a Half Million dollars ($2,500,000). Royal's expert witnesses testified that the total realistic value was approximately One and Half Million ($1,500,000). On the other hand, a *Tyger River* letter written by the independent attorney for CMH, F. Dean Rainey, to the attorneys for Reliance and Royal recited verdicts in comparable cases between Seven and Ten Million Dollars ($7,000,000/$10,000,000).

The evidence simply could not allow this Court to establish a dollar value for the damages claimed by Royal. In point of fact, Royal managed to settle the Woods' claim for approximately one-fourth of its coverage. There is neither evidence nor authority to deem this result a damage or prejudice.

## VI. STATUTE OF LIMITATIONS

■ As indicated Royal's claim is without merit and can not support recovery of any specific damage. Thus, it is almost superfluous to add that this action was not

37. Transcript, p. 114.

brought within the South Carolina Statute of Limitations. Section 15–3–535 Code of Laws of South Carolina requires that an action "must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action." This so-called "discovery" rule received classic formulation in the South Carolina Supreme Court decision of *Snell v. Columbia Gun Exchange*, 276 S.C. 301, 278 S.E.2d 333 (1981):

> The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. The statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed.

In the present case, Royal had formulated a full-blown theory of recovery on January 15, 1997, more than three years and three months before the filing of the Complaint on April 24, 2000. On January 15, 1997, Murray drafted a "File Memorandum" which recited the following:

### ISSUES RELATED TO RELIANCE'S CONDUCT

- Reliance put its self-interest ahead of that of its insured's interest
- Reliance put its self-interest ahead of the Royal's interest as excess carrier.
- Reliance had an obligation to defend under their policy. Little or no meaningful discovery against the co-defendant, the true responsible party, had been conducted prior to the co-defendant's settlement with the plaintiff; the plaintiff's deposition, or the planned settlement conference.
- Reliance appears to have conveyed to the plaintiff its willingness to tender its limits even before the plaintiffs deposition without consulting with Royal.

Royal was disadvantaged by Reliance's settlement because it

- provided the plaintiff with "war chest" to continue the case against the insured and the excess carrier
- gave the plaintiff a comfortable "cushion" of $900,000, allowing the plaintiff to "roll the dice" at trial and making it impossible for Royal to conduct meaningful negotiations.
- Reliance's inadequate defense, up to the point that they paid their money and tendered to Royal, put Royal at a decided disadvantage in applying pressure on the co-defendant to pay a larger share of the settlement Indeed, by the time that Reliance tendered to Royal, the co-defendant had settled out of the case, giving Royal no chance to correct the deficiencies of the inadequate defense furnished by Reliance.
- Reliance conducted virtually no initial local discovery, forcing Royal as excess carrier to retain an investigator to preserve the physical evidence and other important discovery matters.

Reliance had a viable alternative to tendering to the plaintiff. They could have tendered directly to Royal. However, Reliance wanted to cut off its defense expenses the fastest way possible, regardless of how it impacted its insured and Royal as excess carrier.

For the first time in this case, this document (marked as Defendant's Exhibit 9) was authenticated by its author, Gene Murray, at trial:

Q: Is Exhibit Number 9 your file memorandum?

A: Yes, it is.

Q: And just to summarize this, does Exhibit Number 9 basically summarize the claims that you're making here today?

A: Essentially, yes.[38]

In fact, Murray's memorandum states the essence of Royal's claims for negligence (violation of insurance industry custom), bad faith, and equitable subrogation. There is no evidence to suggest that over the next three years Royal made any additional discoveries with respect to its claims. Accordingly, § 15–3–535 Code of Laws of South Carolina must apply with full force.

**Judgment is entered for the Defendant Reliance Insurance Company.**

**AND IT IS SO ORDERED.**