570 S.E.2d 528

**Henry C. CHAMBERS, Respondent,**

v.

**Sumner PINGREE, Jr., Appellant.**

**No. 3518.**

Court of Appeals of South Carolina.

Heard Jan. 8, 2002.

Filed June 17, 2002.

Withdrawn, Substituted and Refiled Sept. 30, 2002.

---

444

Charles E. Carpenter, Jr., and S. Elizabeth Brosnan, of Columbia; James H. Moss and H. Fred Kuhn, Jr., of Beaufort, for appellant.

A. Parker Barnes, Jr., of Beaufort; and James B. Richardson, Jr., of Columbia, for respondent.

## ORDER DENYING PETITION FOR REHEARING

PER CURIAM.

After a careful consideration of the Petition for Rehearing, the Court is unable to discover that any material fact or principle of law has been either overlooked or disregarded and, hence, there is no basis for granting a rehearing. It is, therefore, ordered that the Petition for Rehearing be denied. However, Opinion No. 3518, filed on June 17, 2002, is hereby withdrawn and the attached opinion is substituted therefor.

/S/ Jasper M. Curteon, J.

/S/ H. Samuel Stilwell, J.

/S/ M. Duane Shuler, J.

STILWELL, J.

Henry Chambers filed this action for a real estate commission, and Sumner Pingree, Jr. counterclaimed for recovery on a promissory note. The special referee found Chambers was entitled to the commission and Pingree was entitled to attorney's fees, though nothing on the promissory note. Pingree raises three issues on appeal. We reverse in part and modify in part.

## FACTUAL/PROCEDURAL BACKGROUND

Pingree owned a 5,300 acre tract of land on the Beaufort County coast know as Brays Island. He decided to sell the entire tract, and granted Chambers, a real estate broker, an

exclusive agency agreement with a minimum sales price of $12,000,000.[1] The agreement provided Chambers would receive a commission of 9% of the sale proceeds, or $1,080,000. Special Stipulation 6 of the agreement provided the commission "of 9% herein provided for shall be paid only if the Sale of the Property is consummated, and only out of the proceeds of such Sale." During the exclusive agency agreement, Pingree decided to develop the property himself with Chambers' help.[2] Pingree created Brays Island Company, Inc. (Company), wholly owned by Pingree, and conveyed the property to Company for development. The plan was to create 325 circular one-acre residential lots, with the remaining acreage conveyed to the property owners' association, the Colony Club, for outdoor pursuits, including equestrian sports, dog kennels, a gun club, a shooting course, a private golf course, and a multi-million dollar clubhouse.

In October 1988, Chambers and Pingree executed a "Memorandum of Agreement" (October Agreement) in which Pingree acknowledged owing Chambers a commission of $1,080,000 as a result of the conveyance of the property from Pingree to Company. The agreement further provided Pingree personally would not receive any money from Company for payment of the purchase price of the property until Company sold lots. Because Pingree expended $3,000,000 of his own money in developing Brays Island, the agreement provided:

> [a]fter Pingree has recovered from the sale of lots his development expenditures and the agreed interest thereon, he will pay the commission to Chambers as he receives money from the sale of lots, such payments to be at the rate of 9%, which is the relationship of $1,080,000 to the $12,000,000 sale price. These commissions will continue to be paid on a quarterly basis from Pingree's cash receipts from lot sales until Chambers has received the full $1,080,000.

---

1. A more detailed account of the underlying facts may be found in this court's prior opinion. *Chambers v. Pingree,* 334 S.C. 349, 513 S.E.2d 369 (Ct.App.1999).

2. Chambers was in charge of marketing and was instrumental in obtaining necessary permits. Pingree gifted one lot to Chambers independent of the brokerage agreement, which he later repurchased at Chambers' request.

Pursuant to the agreement, Chambers also received a prepaid commission of $38,000. The closing took place on January 10, 1989. The total purchase price was $12,000,000, and as part of the purchase agreement, Company paid off the $1,301,741.67 mortgage encumbering the property. Pingree paid Chambers a commission equaling 9% of the mortgage payoff, or $117,156.75.

In February 1989, the parties executed another "Memorandum of Agreement" (February Agreement) in which they agreed that the unpaid portion of the $1,080,000 would begin to draw interest at a rate of 10% per annum. The agreement provided the commission would become payable "only if, as and when Pingree is actually paid for the Plantation by the Company." It specifically provided that Pingree would have no obligation to pay the commission except from payments actually received by him "on account of such Sales Price." The parties agreed that since a development loan was outstanding to South Carolina National Bank (SCN), and to comply with SCN's requirements, Pingree would only be paid $40,000 from the sale of each lot.

In May 1989, Chambers executed a promissory note payable to Pingree for $250,000. The note provided that interest would accrue at 10% per annum and payment in full was due by January 2, 1995. The note further provided that all interest payments due by Pingree to Chambers on his commission would be applied to the payment of the note as the interest became payable. Later, an additional $80,000 was added to the note, increasing the amount due to $330,000.

Nearly ninety-four lots were sold while Chambers was broker-in-charge from January 1989 to April 1992. During the year and a half after Pingree took over the management of lot sales, six more lots were sold. By January 1993, Pingree had been paid over $7,400,000 toward the purchase price and Chambers had been paid $462,356.75 toward his original commission. December 29, 1992 was the last date Company paid Pingree for the sale of lots, and Pingree paid Chambers his final commission on January 7, 1993. As lot sales began to slow, the enormous expenses of developing and operating the amenities began to mount. By 1993, Company owed SCN nearly $3,700,000 on the development loan. Pingree, as guarantor of the loan, sought a single buyer for the remaining lots.

In July 1993, Pingree sent letters to homeowners informing them of the financial difficulties Company was experiencing and assuring them that he would not seek an auction or a "fire sale" of the remaining lots because it would adversely affect property values. In response, a group of homeowners formed a limited partnership called Shelbray Associates to purchase 180 of the remaining 195 lots from Company. The total consideration for the sale of the 180 lots was approximately $4,800,000. However, Pingree received the consideration in the form of loan forgiveness and the assumption of tax obligations. Pingree did not receive cash for the purchase.

Chambers sued Pingree to recover the remainder of his commission, and Pingree counterclaimed for repayment of the $330,000 promissory note. The court granted Pingree's motion for summary judgment on his counterclaim, but this court reversed on appeal. *Chambers v. Pingree,* 334 S.C. 349, 513 S.E.2d 369 (1999). On remand, the special referee ruled Chambers was entitled to the remaining unpaid portion of his commission plus accrued interest for a total of $916,500.93. The special referee further found that although Chambers owed Pingree on the promissory note, the interest accruing on the unpaid commission had paid off the balance of the promissory note by December 1995. He found Pingree was entitled to attorney's fees of $17,000 for pursuing payment of the promissory note and applied this amount as a setoff to Chambers' commission.

## STANDARD OF REVIEW

An action for a broker's commission is an action at law. *See United Farm Agency v. Malanuk,* 284 S.C. 382, 383, 325 S.E.2d 544, 545 (1985). An action to recover on a promissory note is also an action at law. *See Wayne Dalton Corp. v. Acme Doors, Inc.,* 302 S.C. 93, 95, 394 S.E.2d 5, 6 (Ct.App. 1990). In law actions tried before a special referee, our review is limited to correcting errors of law, and we are required to uphold the special referee's findings of fact unless there is no evidence to support it. *Townes Assoc., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). Where mixed questions of fact and law are presented, the legal conclusions to be drawn are not entitled to the same deference. *Cf. Hamrick v. Cooper River Lumber Co.,* 223 S.C.

119, 126, 74 S.E.2d 575, 578 (1953) (where meaning of words in contract presented a purely legal question, the appellate court drew its own conclusions without particular deference to the judge below).

## LAW/ANALYSIS

### I. Commission Agreement

■ Pingree first argues the special referee erred in finding Chambers was entitled to the unpaid portion of his broker's commission. We agree.

■ Chambers argues the agreement only affected the timing of commission payments, not whether they were due. The special referee found the February agreement created a condition precedent to payment of the broker's commission. Neither party has appealed this finding, and it is therefore the law of the case. *Charleston Lumber Co. v. Miller*, 338 S.C. 171, 175, 525 S.E.2d 869, 871 (2000) (an unchallenged ruling, right or wrong, is the law of the case). Thus, the sole issue before us is whether Pingree prevented or hindered the occurrence of the condition precedent.

The special referee found Pingree's decision to assign to Shelbray his note and mortgage from Company and to receive forgiveness on his note to SCN as compensation for the sale of the remaining lots to Shelbray prevented his receipt of cash for the sale of the remaining lots. Thus, the special referee reasoned that by preventing the occurrence of the condition precedent to Chambers' right to collect his commission, Pingree effectively or impliedly waived or excused the occurrence of the condition. The special referee based his findings on the monetary benefits Pingree received from the transaction: (1) Shelbray purchased from SCN and then forgave Pingree's $3,750,000 note; (2) Pingree realized a capital loss of $4,670,000 for income tax purposes when he conveyed his purchase money note and mortgage from Company to Shelbray and then used the loss to offset a capital gain of $3,490,000 from an unrelated sale of low-basis stock; and (3) Company was able to retain fifteen unencumbered lots.[3] Be-

---

3. Company eventually sold the lots for $1,913,381. These proceeds were used to pay legitimate corporate debts, and Pingree did not personally receive any proceeds from these sales.

cause Pingree rejected the possibility of an auction of the remaining lots instead of the sale to Shelbray and voluntarily relinquished his mortgage on the fifteen lots retained by Company, the special referee concluded. Pingree prevented the receipt of cash for the lots. Because the special referee found Pingree waived the condition precedent, the nonoccurrence of the condition precedent was excused.

Generally, a broker is entitled to a commission "when he procures a purchaser who is accepted by the owner of the property and with whom the latter enters into a valid and enforceable contract." *Champion v. Whaley*, 280 S.C. 116, 119, 311 S.E.2d 404, 406 (Ct.App.1984). A broker and the owner of the property may " 'make the payment of the broker's commission dependent upon the full performance of the contract of purchase or sale, or postpone the payment of the commission, or make the broker's right to the commission contingent upon the happening of future events.' " *Hamrick* at 124, 74 S.E.2d at 577. A broker assumes the risk of the purchaser's nonperformance where the purchaser's performance is a condition precedent to the owner's duty to pay the broker's commission. *Champion*, 280 S.C. at 119, 311 S.E.2d at 406. A broker suing to recover his commission has the burden of proving all the conditions precedent to his right to performance have occurred. *Champion*, 280 S.C. at 120, 311 S.E.2d at 406. Where a seller prevents or hinders the condition from occurring, the lack of occurrence of the condition precedent is excused and the seller's obligation to pay the broker's commission becomes unconditional. *Id.*

In *Champion*, a broker had an exclusive agency with the sellers of a house which provided that the broker would be entitled to his commission if he sold the house. The broker presented the sellers with an acceptable purchaser, and a contract of sale was executed which was conditioned upon the purchaser obtaining a loan. The sellers subsequently sold the house to a third party who refused to allow appraisers for the original purchaser into the home. Because the home could not be appraised, the original purchaser did not obtain a loan and the original contract of sale became void. The sellers argued the broker was not entitled to his commission because the condition precedent, completing the sale, did not occur.

It is sufficient for the plaintiff to present evidence that the defendant's prevention "substantially contributed" to the nonoccurrence of the condition. Once he has made such proof, the burden shifts to the defendant. If the defendant can show that the condition would not have occurred regardless of the prevention, then the prevention did not contribute materially to its nonoccurrence and the condition is not excused.

*Champion*, 280 S.C. at 122, 311 S.E.2d at 407 (citation omitted). Here, the special referee improperly shifted the burden of proof to Pingree, citing *Champion* for the proposition that he created "uncertainty ... by his wrongdoing." As noted above, Chambers bears the burden of proving Pingree's actions substantially contributed to the prevention of the occurrence of the condition precedent. Only after Chambers satisfied this requirement would Pingree be required to defend his actions and prove that the condition precedent would have occurred regardless.

There is no question the condition precedent did not occur. Although Pingree received benefits in the form of the SCN loan forgiveness from Company's sale of the lots to Shelbray, this did not amount to actual proceeds for payment on the sale of the lots. Company was primarily responsible on the loan, which was used to pay the substantial upkeep costs of the amenities, and Pingree was only secondarily liable as a guarantor. Thus, while Pingree obtained some benefit by being relieved of contingent personal liability, the benefit inured primarily to Company. Because Pingree's personal liability would be triggered only if Company failed to make lot sales, the very event which would result in an actual financial benefit to Pingree would also serve to defeat the condition precedent to payment of Chambers' commission.

 Further, there is no evidence in the record to support the special referee's finding that Pingree intentionally conveyed his purchase money note and mortgage to Shelbray so that he would receive a tax loss to offset capital gains. Pingree testified that the purchase money mortgage he waived had no real value, and Shelbray required the assignment to close the deal and obtain clear title. The tax loss does not count as proceeds from the sale of lots. Pingree utilized the

sizeable capital loss which resulted from the sale to Shelbray to offset the substantial capital gain he incurred from the sale of stock in which he had a low basis. Good tax planning does not make this any less of a loss or any more of a benefit. Neither party envisioned this scenario in drafting the agreement, and Pingree's primary purpose was not to defeat Chambers' commission. That is merely a collateral effect, on which the broker bore the risk.

Finally, allowing Company to retain the fifteen lots free and clear of any mortgage was part of the business transaction between Company and Shelbray which did not amount to proceeds to Pingree. The fifteen lots were retained by Company at Shelbray's insistence to prevent any successful claim by Company's creditors that the transaction was fraudulent and thereby set aside the sale or reach Shelbray's assets. Additionally, the transaction allowed Company to retain enough assets to pay off its remaining debts.

For the condition precedent to be waived or excused, the burden was on Chambers to show that the sale of lots to Shelbray "substantially contributed" to the nonoccurrence of that condition. Chambers failed to meet this burden. We do not find Pingree's actions "substantially contributed" to the nonoccurrence of the condition precedent. The decision to sell to Shelbray was clearly a valid business decision and prevented the imminent possibility of bankruptcy. *Champion* clearly implies that the prevention of the condition precedent must be intentional or entail wrongdoing. There is no such wrongdoing here. Whereas the sellers in *Champion* deliberately repudiated their contract to pay a commission to the broker by preventing the fulfillment of the contract, Pingree continued to abide by the commission agreement by paying Chambers each time Pingree received proceeds from the sale of lots. It was only after the lots failed to sell that Pingree, as chairman for Company, decided to sell the remaining lots to Shelbray.

We decline to impose an obligation on Pingree to do everything in his power to maximize Chambers' commission. In our view, the law does not so require. He does not have to put all his assets at risk to assure Chambers is paid his commission. The special referee found that Pingree's disposi-

tion was reasonable and preserved his vision for the development. We find no indication of bad faith. The law does not require that the highest possible price be Pingree's exclusive or even primary concern. The seller is not required to put the broker's interests ahead of his own. In a case with virtually identical facts, another court reached this same conclusion. *See Brown v. Watt,* 256 Cal.App.2d 44, 63 Cal.Rptr. 815 (1967) (Where agreement provided broker would receive commission only as and when lots were sold, no further commissions were due where broker failed to prove condition precedent occurred or was excused and unanticipated rapid decline of local housing market was beyond control of either party.). We find the good faith decision to prevent the bankruptcy of Company and to attain Pingree's vision for the completion of this unique development was a valid business decision and did not amount to interference in the occurrence of the condition precedent.

Breach of contract is an action at law, and we must adopt the special referee's findings of fact if they are supported by any evidence. However, where the wrong legal conclusions are drawn or the law misapplied, we are obligated under our standard of review to correct such errors.[4] These are two sophisticated businessmen, each capable of protecting his own interests. Chambers assumed the risk that Company would be unable to sell the lots, thus preventing Pingree from receiving payments from the proceeds and preventing Chambers from receiving further commissions. Because we find Pingree did not purposefully interfere with or avoid Chambers' commission, we reverse the judgment in favor of Chambers.

## II. Promissory Note

Pingree argues the special referee erred in finding Chambers owed nothing on the promissory note. We agree.

The terms of the promissory note specified that the interest payments owed to Chambers on his commission would be

---

4. Normally we are limited by our scope of review to correcting errors of law. However, in the special referee's order, he noted that some items listed in the findings of fact may be better considered conclusions of law.. Where the special referee made conclusions of law in his findings of fact, we have so construed them.

applied to the payment of the promissory note "as that interest became payable." Otherwise, payment on the promissory note was due in full by January 2, 1995. The promissory note also provided that Pingree would be entitled to recover attorney's fees if he had to seek the services of an attorney to collect payment on the promissory note. The special referee awarded Pingree $17,000 as attorney's fees, but used that sum as an offset against the amount Chambers was awarded against Pingree.

The special referee calculated the balance remaining on the promissory note was $119,793.01 as of January 7, 1993, when the last commission payment was made by Pingree to Chambers. The special referee then had to determine, consonant with his other rulings, when that promissory note would have been paid off by applying accrued but unpaid interest due on the remaining commission. Since we have determined that no future commission payments were due, that is unnecessary. We agree with the special referee that interest payments were due as the commission payments were due. Since no commission payments were due after January 7, 1993, no interest payments were due.

The parties do not dispute that the only payments made on the note were the interest applied by virtue of commissions paid by Pingree to Chambers. Because the commission interest only became payable on the promissory note as Chambers received commission payments, the amount due on the promissory note as of January 7, 1993, $119,793.01, is still owed by Chambers to Pingree, plus accrued interest from that date, together with the attorney's fees awarded by the special referee. We accordingly modify the special referee's order to award judgment to Pingree in such amount.

**REVERSED IN PART AND MODIFIED IN PART.**[5]

CURETON and SHULER, JJ., concur.

---

5. Pingree's remaining issue on appeal concerns the admissibility of a legal research memo produced in discovery to show Chambers' understanding of when the commission was due under the parties' agreement. Because we reverse, we decline to reach this issue.