617 S.E.2d 125

**THE HUFFINES COMPANY, LLC, Respondent,**

v.

**Nancy R. LOCKHART and Morrison
Payne as Trustee, Appellants.**

**No. 3994.**

Court of Appeals of South Carolina.

Submitted May 1, 2005.

Decided May 23, 2005.

Rehearing Denied Aug. 26, 2005.

180

182

Edward M. Brown, of Charleston, for Appellants.

W. Mullins McLeod, Jr. and M. Todd Rainsford, both of Charleston, for Respondent.

ANDERSON, J.

The Huffines Company, LLC, initiated this action against Nancy R. Lockhart (Lockhart) to recover a real estate brokerage commission. The circuit court found that Lockhart had breached the parties' Listing Agreement and directed a verdict in favor of the Huffines Company, LLC. We reverse and remand for a new trial.[1]

## FACTUAL/PROCEDURAL BACKGROUND

Calvert Huffines (Huffines) is a licensed real estate broker in South Carolina. He owns the Huffines Company, LLC, a small real estate company located in Colleton County. Lockhart hired Huffines to find a buyer for fifty acres of land located in Hendersonville, South Carolina (the Hendersonville property). She listed the Hendersonville property with Huffines on April 26, 1999, for a selling price of $250,000. The Listing Agreement provided, in pertinent part:

I (we), the seller(s), grant you the right to sell or transfer this property from the date of this agreement to and including *4/30/2000*, and to accept deposit thereon, and

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

employ you to procure a purchaser, ready, willing and able to buy this property at the listed price and terms, or at a price and terms that are acceptable to me. . . .

If a buyer or transferee ready, willing and able to buy or exchange for this property is procured by you, I agree to pay you a commission of 10% of the selling price, or a minimum commission of $200, whichever is greater.

If within six months after the termination of this agreement I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission. . . .

Huffines subsequently marketed the Hendersonville property. He informed area brokers of the listing, talked to neighboring property owners, and disseminated plats and descriptions of the property. Huffines learned from a newspaper article that the Colleton County School Board (the School Board) was searching for property suitable for a new school. On November 10, 1999, he wrote a letter to the Colleton County Department of Education and School Board members to inform them that the Hendersonville property was for sale and "would make an excellent site for a school."

Elbert O. Duffie, general counsel for the Colleton County School District, was retained to seek out suitable properties for the new school. He compiled a list of twenty or thirty sites that met the School Board's criteria. The Hendersonville property was not placed on his initial list of suitable properties. However, Duffie was later forwarded a copy of the letter Huffines sent to the School Board. Duffie contacted Huffines and the two began a series of conversations concerning the property. Eventually, Duffie placed the Hendersonville property on his list of possible properties for the School Board to purchase.

Duffie informed Huffines that the School Board would be willing to pay a maximum of $3,500 an acre for the property. Huffines conveyed this information to Lockhart in an email dated March 20, 2000. Lockhart responded by email that same day, instructing Huffines to let the School Board know she was willing to accept that amount for the property. On March 21, 2000, the School Board held a regular meeting at which the trustees authorized Duffie to secure an option to

purchase the Hendersonville property for $3,500 an acre. Duffie prepared a draft option contract. The School Board agreed to pay $1,000 for the option. On March 22, 2000, Lockhart emailed Huffines, informing him she did not feel the offer was a good one and requesting additional information about the transaction.

Duffie's next communication concerning the property was from Edward M. Brown, Lockhart's attorney. In a letter dated April 24, 2000, Brown informed Duffie that he had been asked to intercede in the real estate transaction. The letter stated that $3,500 an acre was unacceptable. Huffines received a letter from Lockhart, dated April 24, 2000, which requested he direct all communications concerning the property to Brown.

On April 30, 2000, the Listing Agreement expired. However, the agreement provided that Huffines was still entitled to a commission if the property was sold or transferred within six months of the expiration of the agreement to a buyer procured by Huffines. The six-month time period ran until October 30, 2000.

Brown and Duffie continued to negotiate the sale of the property after the Listing Agreement expired. Lockhart demanded a new price of $5,000 an acre and an option price of $10,000. The School Board trustees subsequently rejected the $5,000 an acre offer. Lockhart reduced the asking price to $4,500 an acre with a $1,000 option price. The trustees voted to accept that purchase price, and the parties signed an option contract on May 8, 2000. The option contract stated:

> Whereas, it is agreed that the Option price of the property located on Highway 17–A (Hendersonville Highway), near the Community of Hendersonville, in Colleton County, South Carolina, TMS# 234–00–00–042, containing fifty (50) acres, more or less, and one (1) improvement shall be Four Thousand Five Hundred and No/100 ($4,500.00) Dollars per acre . . .
>
> . . . [B]ut in the event that the Option is not exercised within one hundred eighty (180) days, the Optionor is no longer obligated and may retain the One Thousand and No/100 ($1,000.00) Dollar consideration. . . .

Pursuant to a United States District Court Consent Order, issued on November 17, 1999, the School Board was required to obtain permission from the United States Justice Department before building a new school at a designated site. Duffie contacted a Justice Department attorney, Dan Foreman, prior to 2000. They subsequently discussed obtaining approval for the placement of a school upon the Hendersonville property. In early September of 2000, Foreman visited Colleton County and viewed the Hendersonville property. After observing the site, Foreman orally informed Duffie that the property was suitable for the purpose of a school. However, written approval was not forthcoming until November 1, 2000.

Lockhart testified that at some point after she signed the Listing Agreement, her half brother indicated he thought he should share in any proceeds obtained from the Hendersonville property. He later informed Lockhart that he had retained an attorney to pursue his claim. Lockhart filed a clear title action on September 18, 2000. Lockhart was adjudged the owner of the property in fee simple absolute on November 13, 2000.

On October 17, 2000, the School Board trustees voted to purchase the Hendersonville property pending approval from the U.S. Justice Department. Although no contract of sale was ever signed, Lockhart sold the Hendersonville property to the School Board on November 16, 2000, for $4,500 an acre.

Huffines attended the closing, but Lockhart refused to pay him a commission. The Huffines Company, LLC initiated this action alleging Lockhart breached the Listing Agreement by not paying Huffines a commission. The circuit court directed a verdict in favor of the Huffines Company, LLC on the breach of contract claim in the amount of $21,906. Additionally, the circuit judge held that Huffines procured a buyer in March of 2000 when he negotiated to sell the property for $3,500 an acre. The judge ruled that a sale or transfer of the property occurred in May of 2000 (within the six-month expiration period) when the School Board signed the option contract. He further held that a sale or transfer occurred on October 17, 2000, when the School Board voted to exercise the option contract. The jury rendered a verdict in favor of the Huffines Company on a breach of contract accompanied by a

fraudulent act claim. However, no punitive damages were awarded.

## STANDARD OF REVIEW

 "In ruling on motions for directed verdict or judgment notwithstanding the verdict, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions. The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt." *Steinke v. South Carolina Dep't of Labor, Licensing & Reg.*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999); *accord Hurd v. Williamsburg County*, 363 S.C. 421, 611 S.E.2d 488 (2005); *Hinkle v. Nat'l Cas. Ins. Co.*, 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003); *Collins Entertainment, Inc. v. White*, 363 S.C. 546, 611 S.E.2d 262 (Ct.App. 2005); *Lingard v. Carolina By–Products*, 361 S.C. 442, 446, 605 S.E.2d 545, 547 (Ct.App.2004); *Sims v. Giles*, 343 S.C. 708, 714, 541 S.E.2d 857, 860 (Ct.App.2001). If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should have been denied. *Jinks v. Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003); *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995).

 A motion for directed verdict goes to the entire case and may be granted only when the evidence raises no issue for the jury as to liability. *Carolina Home Builders, Inc. v. Armstrong Furnace Co.*, 259 S.C. 346, 358, 191 S.E.2d 774, 779 (1972). When the evidence yields only one inference, a directed verdict in favor of the moving party is proper. *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 476–77, 514 S.E.2d 126, 130 (1999); *Sims v. Giles*, 343 S.C. 708, 714, 541 S.E.2d 857, 860 (Ct.App.2001). However, if the evidence as a whole is susceptible of more than one reasonable inference, the case must be submitted to the jury. *Hurd v. Williamsburg County*, 363 S.C. 421, 611 S.E.2d 488 (2005); *Quesinberry v. Rouppasong*, 331 S.C. 589, 594, 503 S.E.2d 717, 720 (1998); *Getsinger v. Midlands Orthopaedic Profit Sharing Plan*, 327 S.C. 424, 426, 489 S.E.2d 223, 223 (Ct.App.1997).

When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Harvey v. Strickland*, 350 S.C. 303, 308, 566 S.E.2d 529, 532 (2002); *Pond Place Partners v. Poole*, 351 S.C. 1, 15, 567 S.E.2d 881, 888 (Ct.App.2002); *Boddie–Noell Props., Inc. v. 42 Magnolia P'ship*, 344 S.C. 474, 482, 544 S.E.2d 279, 283 (Ct.App.2000), *aff'd as modified by* 352 S.C. 437, 574 S.E.2d 726 (2002). The issue must be submitted to the jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror. *Hanahan v. Simpson*, 326 S.C. 140, 149, 485 S.E.2d 903, 908 (1997). Yet, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury. *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 461, 494 S.E.2d 835, 842 (Ct.App.1997). Our courts have recognized that when only one reasonable inference can be deduced from the evidence, the question becomes one of law for the court. *Bell v. Bank of Abbeville*, 211 S.C. 167, 173, 44 S.E.2d 328, 330 (1947); *Small*, 329 S.C. at 461, 494 S.E.2d at 841–42. A corollary of this rule is that verdicts may not be permitted to rest upon surmise, conjecture, or speculation. *Hanahan*, 326 S.C. at 149, 485 S.E.2d at 908; *Small*, 329 S.C. at 461, 494 S.E.2d at 841–42. This does not mean the court should ignore facts unfavorable to the opposing party. *Long v. Norris & Assocs., Ltd.*, 342 S.C. 561, 568, 538 S.E.2d 5, 9 (Ct.App.2000); *Love v. Gamble*, 316 S.C. 203, 208, 448 S.E.2d 876, 879 (Ct.App.1994). In deciding whether to grant or deny a directed verdict motion, the trial court is concerned only with the existence or nonexistence of evidence. *Pond Place Partners, Inc.*, 351 S.C. at 15, 567 S.E.2d at 888.

This Court will reverse only where there is no evidence to support the trial court's ruling, or where the ruling was controlled by an error of law. *Clark v. S.C. Dep't of Public Safety*, 362 S.C. 377, 382–83, 608 S.E.2d 573, 576 (2005); *Steinke v. South Carolina Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999); *Abu–Shawareb v. S.C. State Univ.*, 364 S.C. 358, 613 S.E.2d 757 (Ct.App.2005); *Welch v. Epstein*, 342 S.C. 279, 300, 536 S.E.2d 408, 418 (Ct.App.2000). Essentially, our Court must resolve whether it would be reasonably conceivable to have a verdict for a party opposing the motion under the facts as

liberally construed in the opposing party's favor. *Harvey,* 350 S.C. at 309, 566 S.E.2d at 532; *Hanahan,* 326 S.C. at 149, 485 S.E.2d at 908.

## *LAW/ANALYSIS*

Lockhart argues the circuit court erred in granting a directed verdict in favor of Huffines. We agree.

The Listing Agreement provided alternative conditions precedent to the broker's right to recover a commission. The first condition precedent required Huffines to procure a buyer or transferee who was "ready, willing and able to buy or exchange" for the Hendersonville property. Alternatively, Huffines was entitled to a commission if Lockhart actually sold or transferred the property to a "prospect procured by [Huffines]" within six months after the termination of the Listing Agreement. The circuit court erred in ruling Huffines was entitled to payment under either clause.

### I. Ready, Willing, and Able

First, Lockhart contends the circuit court judge erred in directing a verdict on the basis that Huffines procured a buyer when the Listing Agreement required him to procure a *ready, willing, and able* buyer. We agree.

In issuing his ruling, the circuit judge stated:

"[I]t was Mr. Huffines who made this deal take place, who put Ms. Lockhart in the position of selling this piece of property to the School District.

There is no way in the facts of this case that this piece of property would have ever been sold to the School District had it not been for the work that Mr. Huffines did.

Now, under those circumstances, and when Mr. Huffines brings this deal to the table and gets an agreement between them within the one year of the listing agreement, that is clearly to procure a purchaser within the term of that contract, and clearly he is entitled to his ten percent commission.

In the absence of an agreement, a broker is entitled to a commission when he procures a sales contract that is both valid and enforceable by the seller, regardless whether

the contract actually closes. *Helms Realty, Inc. v. Gibson–Wall Co.*, 363 S.C. 334, 611 S.E.2d 485 (2005); *Dantzler Real Estate, Inc. v. Boland,* 276 S.C. 275, 277–78, 277 S.E.2d 705, 706 (1981); *Cass Co. v. Nannarello,* 274 S.C. 326, 328, 262 S.E.2d 924, 926 (1980); *Thomas–McCain, Inc. v. Siter,* 268 S.C. 193, 196, 232 S.E.2d 728, 729 (1977); *Chambers v. Pingree,* 351 S.C. 442, 451, 570 S.E.2d 528, 532 (Ct.App.2002). The fact that a buyer and seller enter into a sales agreement without the broker's knowledge does not defeat his right to commission. *Dantzler,* 276 S.C. at 278, 277 S.E.2d at 706.

"The broker and the owner may, however, make the broker's right to the commission contingent upon the occurrence of certain conditions." *Champion v. Whaley,* 280 S.C. 116, 119, 311 S.E.2d 404, 406 (Ct.App.1984) (citing *Hamrick v. Cooper River Lumber Co.,* 223 S.C. 119, 74 S.E.2d 575 (1953)); *accord Chambers,* 351 S.C. at 451, 570 S.E.2d at 532. A real estate broker suing on a conditional sales contract has the burden of proving that all conditions precedent to his right to a commission have occurred. *Champion,* 280 S.C. at 120, 311 S.E.2d at 406; *Griffith v. Newell,* 69 S.C. 300, 48 S.E. 259 (1904). "A broker assumes the risk of the purchaser's nonperformance where the purchaser's performance is a condition precedent to the owner's duty to pay the broker's commission." *Chambers,* 351 S.C. at 451, 570 S.E.2d at 532; *accord Champion,* 280 S.C. at 119, 311 S.E.2d at 406.

As a threshold matter, we note the Listing Agreement does not define "procure." According to *The American Heritage Dictionary* 958 (2nd College ed.1982), the term means "[t]o obtain; acquire," or, "[t]o bring about." *Williston on Contracts* observes that procurement has been defined as "consisting of the broker's efforts that are the efficient cause, but not necessarily the sole cause, of a series of unbroken, continuous events, which culminate in the accomplishment of the objective of the employment." 23 *Williston on Contracts* § 62:19 (4th ed.2004). *Cf. Edmonds v. Coldwell Banker Residential Real Estate Servs. Inc.,* 237 Va. 428, 377 S.E.2d 443 (1989) (finding a real estate broker is the procuring cause of a sale when it has originated or caused a series of events which, without break in their continuity, result in the accomplishment of the prime object of its employment).

Lockhart admits that Huffines found a buyer for her property. When asked if Huffines introduced the School Board to her, she replied, "He found the School Board, yes." Duffie testified as follows to Huffines' role in brokering the transaction: "The property would not have been recommended by me or it wouldn't have been put on the list that the School Board was utilizing as a list of potential properties to buy.... I had specifically excluded it." It is clear from the record that but for the involvement of Huffines, the School Board would not have considered the Hendersonville property. Accordingly, we find that Huffines did procure the School Board for the purposes of the Listing Agreement. However, whether the School Board was a ready, willing, and able buyer is a separate inquiry.

■■■ The School Board was governed by the Consent Order which stated: "[T]he District will present any proposed site for a new school to the United States for its approval...." Lockhart argues the School Board was not able to purchase the property until Justice Department approval was granted on November 1, 2000. Thus, she asserts Huffines did not procure a buyer who was ready, willing, and able to purchase the property before the expiration of the Listing Agreement on April 30, 2000.

> Each of the words "ready," "willing," and "able" expresses an idea that the others do not convey. All three of these elements must exist in the customer, in order to entitle the broker to a commission. It is not sufficient that the customer is ready and willing, but he or she must also have the ability to carry out the loan, sale, purchase, or exchange. So also, the procurement of a ready, willing, and able purchaser by a broker involves not only a showing that the purchaser has the financial ability to complete the contract, but also that the purchaser is ready and willing to purchase at a price and on terms prescribed by the vendor.

> . . . .

> In determining whether a ready, willing, and financially able purchaser is produced, developments subsequent to the time the transaction is closed, are not considered and are irrelevant.

12 C.J.S. *Brokers* § 225 (2004) (footnotes omitted). *See generally* Annotation, 87 A.L.R.4th 11 (observing the requirements of providing an "able" buyer; noting the term "able" refers to both legal and financial ability; and discussing numerous issues pertaining to a potential buyer's financial ability).

■ Conflicting testimony exists concerning the application of the required Justice Department approval. Lynette Bryant Fryar served on the School Board during the negotiations over the purchase of the Hendersonville property. At trial, Fryar averred the School Board could not have purchased the property in question without approval from the United States Justice Department. Duffie, however, testified the permission sought was not to *purchase* the property in question, but to build a school on that piece of property. He stated the School District could have purchased the Hendersonville property without the Justice Department's approval. Furthermore, even had the School Board been financially able to purchase the Hendersonville property without Justice Department approval, a jury might find that it would be unwilling to do so if the Justice Department withheld its permission to allow the School Board to build a new school on the property.

Consequently, we hold the circuit court erred in ruling Huffines earned his commission under the clause requiring him to procure a ready, willing, and able buyer within the time limits of the Listing Agreement. More than one reasonable inference can be drawn from the evidence in the record. Therefore, this issue should have been submitted to the jury.

## II. Sale or Transfer Within Six Months of Expiration

Lockhart contends the circuit court erred in finding the property was sold for purposes of the Listing Agreement when the School Board signed the option agreement, and when the School Board voted to exercise the option.

The Listing Agreement stated: "[I]f within six months after the termination of this agreement I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission." Thus, even if Huffines failed to procure a ready, willing, and able buyer before the expiration of the Listing Agreement, he is nonethe-

less entitled to a commission if the property actually sold by October 30, 2000—within six months of the agreement's expiration.

The circuit court judge proclaimed:

... I am ruling that in May of 2000 when the School District signed the option agreement that that is a sale or transfer of the property as those terms are used in this contract, and I'm also ruling that in October—on the 17th of October 2000, when the School District voted to exercise the option that they had signed, that that also was a sale or transfer of the property.

And I fully understand that those—that neither of those actions taken by the School District were binding on the School District.

They could have changed their minds, but the—using the language of procured by you, that is a sale or is—that is indistinguishable on the facts of this case from the contract for sale that is entered into as it would be under normal circumstances.

■■■ A sale of real property is complete when the seller has an unconditional right, under a valid contract of sale, to demand performance from a purchaser. *See Champion,* 280 S.C. at 119, 311 S.E.2d at 406. No sales contract was executed in this case. However, an option contract was entered into between Lockhart and the School Board on May 8, 2000.

■■■■■ It is well settled in South Carolina that an option contract merely gives the right to purchase, without imposing any obligation to do so. *Faulkner v. Millar,* 319 S.C. 216, 220, 460 S.E.2d 378, 380 (1995). An option is to be distinguished from a sale or a contract to sell. *Hutto v. Wiggins,* 175 S.C. 202, 205, 178 S.E. 869, 871 (1935).

The chief difference between a contract to sell and purchase real property, and an option to purchase said property lies in the fact that, while the former creates a mutual obligation on the part of one party to sell and the other to purchase, the option merely gives the right to purchase, at a

fixed price, within a fixed time, without imposing any obligation to do so.

*Id.*

An option contract is a promise which limits the promisor's power to revoke an offer. *Faulkner,* 319 S.C. at 220, 460 S.E.2d at 380. An optionee who is not in possession of property assumes no risk and enjoys no interest in the property. *Edens & Avant Invest. Prop. v. Amerada Hess Corp.,* 318 S.C. 134, 136, 456 S.E.2d 406, 407 (Ct.App.1995).

In *Ingram v. Kasey's Associates,* 340 S.C. 98, 531 S.E.2d 287 (2000), our supreme court edified:

Option contracts generally have three main characteristics: (1) they are unilateral contracts where the optionor, for a valuable consideration, grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; (2) they are continuing offers to sell, irrevocable during the option period; and (3) the transition of an option into a contract of purchase and sale can only be effected by an unqualified and unconditional acceptance of the offer in accordance with the terms and within the time specified in the option contract.

*Id.* at 108, 531 S.E.2d at 292. Option contracts are strictly construed in favor of the optionor and against the optionee. *Id.* (citing *Cotter v. James L. Tapp Co.,* 267 S.C. 647, 230 S.E.2d 715 (1976)).

We disagree with the circuit court that the parties intended an option contract to be considered a sale for the purposes of the Listing Agreement. The two sentences at issue in this case provide different mechanisms for triggering Huffines' entitlement to a commission. Under the first provision, Huffines' commission was not contingent upon the sale of the property. He would have been entitled to his commission even if no sale occurred, *provided* he procured a buyer who was ready, willing, and able to purchase. This provision is more broker-friendly than the common-law default rule which makes payment contingent upon the buyer and seller entering into a contract for the sale of the property.

The second provision makes actual sale or transfer within six months of the expiration of the listing agreement the

trigger for payment of a commission. There is simply nothing to suggest that the parties meant anything other than "sell or transfer" when they used those terms in the Listing Agreement. An option to purchase does not give the seller an enforceable right and is not a sale. Accordingly, we hold that Huffines did not become entitled to a commission when the parties entered into the option contract.

 Huffines argues Lockhart (1) interfered with his ability to negotiate the selling price under the Listing Agreement by hiring an attorney prior to April 30, the agreement's expiration date, and (2) prevented the property from selling within the sixth-month period. He contends that "even if the listing agreement contained a condition precedent, Huffines would still be entitled to his commission" because Lockhart prevented the condition from occurring.

On April 24, 2000, six days before the expiration of the Listing Agreement, Lockhart informed Huffines via letter that Brown would be handling negotiations of the property. As a result, Lockhart made a counteroffer to the School Board's proposal of $3,500 per acre through Brown rather than Huffines.

On September 18, 2000, Lockhart filed a clear title action to adjudicate the ownership of the Hendersonville property. According to Lockhart, her half brother informed her that "he was the oldest child, ... that he should be the one to distribute the property," and that "he thought he should have it." Her half brother allegedly informed Lockhart that "he had gotten an attorney in Savannah .... [t]o see what he could get." In response, Lockhart filed the clear title action. Lockhart's brother did not make an appearance, however. He was adjudged in default, and Lockhart was decreed owner of the Hendersonville property in fee simple absolute.

 A broker ordinarily has the burden of proving that any conditions precedent to the duty of the seller to pay have been fulfilled. *Champion,* 280 S.C. at 120, 311 S.E.2d at 406. However, if a seller prevents a condition from occurring, then the condition is excused and his obligation to pay becomes unconditional. *Id.* (citing *Shear v. National Rifle Association of America,* 606 F.2d 1251 (D.C.Cir.1979)); *Chambers v. Pingree,* 351 S.C. 442, 451, 570 S.E.2d 528, 532–33 (Ct.App.2002);

*see also Helms Realty,* 363 S.C. 334, 339 n. 2, 611 S.E.2d 485, 487 n. 2 (2005) ("A party that wrongfully prevents satisfaction of a condition precedent to its performance is not excused from performing."). "It is sufficient for the plaintiff to present evidence that the defendant's prevention 'substantially contributed' to the nonoccurrence of the condition." *Chambers,* 351 S.C. at 452, 570 S.E.2d at 533. If the seller can then prove that the condition precedent would not have occurred regardless of the prevention, then the condition is not excused. *Id.*

In *Champion v. Whaley,* 280 S.C. 116, 311 S.E.2d 404 (Ct.App.1984), Champion had an exclusive listing agreement with the sellers. The agreement made Champion's commission contingent upon selling the house. Champion procured a potential buyer, Bell. Bell and the sellers entered a contract for the sale of the house, contingent upon Bell's obtaining financing. However, the sellers soon informed Champion that they had sold the house to another buyer. Loan officers, in the process of finalizing Bell's loan, attempted to appraise the house, but found it occupied by a man who told them he had purchased the house from the sellers. As a result, Bell's loan was not finalized.

Pursuant to the agreement, "[a] sale would be completed when the Sellers had an unconditional right, under a valid contract of sale, to demand performance from a purchaser procured by Champion." 280 S.C. at 119, 311 S.E.2d at 406. "Until that time, the risk of the purchaser's nonperformance was on Champion." *Id.* at 119, 311 S.E.2d at 406. We observed: "almost all cases in which prevention is alleged will involve speculation as to what would have happened had the defendant's conduct not taken place." 280 S.C. at 121, 311 S.E.2d at 407. "In view of the difficulties of proof created by the Sellers' own conduct," we held that

> Champion was not required to show the loan would have closed "but for" the prevention of the condition. It is sufficient for the plaintiff to present evidence that the defendant's prevention 'substantially contributed' to the nonoccurrence of the condition. . . . Once he has made such proof, the burden shifts to the defendant. If the defendant can show that the condition would not have occurred regardless of the prevention, then the prevention did not contrib-

ute materially to its nonoccurrence and the condition is not excused.

280 S.C. at 122, 311 S.E.2d at 407. We remanded so that a jury could decide the question of prevention. Subsequently, in *Chambers v. Pingree*, 351 S.C. 442, 453, 570 S.E.2d 528, 534 (Ct.App.2002), we articulated: *"Champion* clearly implies that the prevention of the condition precedent must be intentional or entail wrongdoing."

The record contains conflicting evidence concerning the allegation that Lockhart instituted the clear title action to delay the closing. Lockhart's brother did not make an appearance in the clear title action. Moreover, Lockhart's father deeded the property to her in September of 1997. However, the original option extended through November 10, 2000. Thus, the property might have sold outside the sixth-month period even if the clear title case had not been filed. Additionally, when asked if the clear title action had any effect on the School Board exercising its option, Duffie declared: "None that I know of." Yvonne Robinson, a member of the School Board during the time of the events in question, testified Lockhart did nothing to delay the closing.

The issue is one for a jury to resolve. If a jury finds the School Board was not a ready, willing, and able buyer, Huffines may still be entitled to the commission if the jury finds that Lockhart intentionally prevented the occurrence of the alternative condition precedent.

## CONCLUSION

Viewing the evidence in the light most favorable to Lockhart, the factual issues are capable of more than one reasonable inference. The Listing Agreement entitled Huffines to a commission only if (1) Huffines procured a ready, willing, and able buyer before the expiration of the agreement, or (2) Lockhart sold or transferred the property within six months of the expiration of the Listing Agreement to a prospect procured by Huffines. Whether the School Board was a ready, willing, and able buyer was a question for the jury. Additionally, whether Lockhart intentionally prevented the occurrence of the, alternative condition precedent is a jury issue. For edification on remand, we hold that a sale did NOT

take place within the sixth-month expiration period. The directed verdict was thus improper. We reverse and remand this case for a new trial.

**REVERSED AND REMANDED.**

STILWELL, and WILLIAMS, JJ., concur.